**FILED - LN**
December 21, 2018 12:29 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: __clw /____   SCANNED BY ꞇꞇꞇ  ꞇ2ꞇ2ꞇ

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF MICHIGAN, ex rel, SCOTT STONE and BETHANY MCKINLEY, | ) ) ) | **1:18-cv-1416** |
|  | ) | **Janet T Neff** |
| Plaintiffs-Relators, | ) | **U.S. District Judge** |
|  | ) |  |
| -vs- | ) |  |
|  | ) |  |
| TRAVERSE ANESTHESIA ASSOCIATES, P.C., a domestic professional corporation, PHYMED HEALTHCARE GROUP, LLC, a Delaware limited liability corporation, MARK AULICINO, M.D., FREDERICK CAMPBELL, M.D., EDWARD VOMASTEK, D.O., BRIAN KIESSLING, M.D., TIMOTHY ESSER, M.D., MATHEW MARTIN, M.D., ROBERT DAVID DENYER, A.A., CYNTHIA RANKIN, A.A., and DENISE CAMPBELL, Jointly and Severally, | ) ) ) ) ) ) ) ) ) ) ) ) ) | <u>**MATTER FILED IN CAMERA AND UNDER SEAL**</u> |
|  | ) |  |
| Defendants. | ) |  |

**HERTZ SCHRAM PC**
BY:  PATRICIA A. STAMLER (P35905)
      MATTHEW TURCHYN (P76482)
*Attorneys for Plaintiff*
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 335-5000
pstamler@hertzschram.com
mturchyn@hertzschram.com

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

{H0606391.1}

NOW COME Plaintiffs-Relators, SCOTT STONE and BETHANY McKINLEY (hereafter "Relators"), on behalf of themselves, and on behalf of the United States of America and the State of Michigan, by and through their attorneys, HERTZ SCHRAM PC, and hereby file their Complaint under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), 31 U.S.C. §§ 3729-3733, the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, and the Michigan Medicaid False Claims Act ("MFCA"), MCL 400.601 *et seq.* (" Acts") and state as follows:

## SEALED COMPLAINT

1.      Under the FCA, this complaint is to be filed in camera and remain under seal for a period of at least sixty (60) days.  31 U.S.C. § 3730(b) (2).

2.      Under the MFCA the complaint is to be filed in-camera and remain under seal for a period of at least ninety (90) days.  M.C.L. 400.610a.

3.      The complaint shall not be served on Defendants until the Court so orders following the intervention periods by the federal and state governments.  31 U.S.C. § 3730(b)(2); M.C.L. 400.610a(2).

4.      The federal government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence disclosure.  31 U.S.C. § 3730(b)(2).

5.     The State of Michigan may elect to intervene and proceed with the action within ninety (90) days after it receives both the Complaint and the evidentiary disclosure.  M.C.L. 400.610a (3).

## JURISDICTION AND VENUE

6.     This action arises under 31 U.S.C. § 3729 *et seq.*, 31 U.S.C. §§ 3729-3733, the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, and the Michigan Medicaid False Claims Act, MCL 400.601 *et seq.* (the " Acts" ), and the common law to recover treble damages and civil penalties on behalf of the United States of America and the State of Michigan arising out of the Defendants' submission of fraudulent claims to the United States and the State of Michigan Governments through the federal Medicare and the federal and state Medicaid program.

7.     31 U.S.C. § 3732 provides that this Court has exclusive jurisdiction over actions brought under the Federal False Claims Act and concurrent jurisdiction over state claims arising from the transactions giving rise to the claims under such Act.  In addition, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1345 and 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.  Further, this Court has jurisdiction under 31 U.S.C. § 3732(b) over any action brought under the laws of any state for the recovery of funds paid by state or local government if the action arises from the same transaction or occurrence as

an action brought under § 3732. This is also an action to obtain damages, assessments, civil monetary penalties, and exclusion from all federal health care programs pursuant to 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, which provisions are known as the Civil Monetary Penalties Law ("CMPL").

8.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 3732(a) of the Act which provides that " any action under 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act prescribed by § 3729 occurred."   The acts which are the subject of this action, occurred in the Western District, including Traverse City, in the State of Michigan, within this judicial district.

9.  As required under § 3730(b)(2) of the FCA, Relators provided to the Attorney General of the United States and to the United States Attorney for the Western District of Michigan, prior to the filing of this Complaint, statements of all material evidence and information related to the Complaint (the "Evidentiary Disclosure").  Relators have also provided the Attorney General of the State of Michigan a copy of the Evidentiary Disclosure pursuant to M.C.L. 400.610a(2).

10.  Relator is the original source of the information of the allegations contained in this complaint.

## PARTIES

11.     Relator Scott Stone for all times relevant to this Complaint is a resident of Traverse City, Michigan, located in the Western District of Michigan, and for all times relevant to this Complaint is a Certified Registered Nurse Anesthetist ("CRNA").

12.     Relator Bethany McKnight for all times relevant to this Complaint is a resident of Traverse City, Michigan, located in the Western District of Michigan, and for all times relevant to this Complaint is a Certified Registered Nurse Anesthetist ("CRNA").

13.     Defendant Traverse Anesthesia Associates, P.C. (hereafter "TAA") is for all times relevant to this Complaint a domestic professional corporation located at 4100 Park Forest Dr., #210, Traverse City, Michigan, located in the Western District of Michigan.

14.     Defendant PhyMed Healthcare Group, LLC (hereafter "PHYMED"), operates under the assumed name of PhyMed Healthcare Group, is for all times relevant to this Complaint a Delaware limited liability corporation with its principal office located at 110 29th Avenue N., Suite 100, Nashville, Tennessee, and does business in the Western District of Michigan.

15.     Defendant Mark R. AULICINO, M.D. (hereafter "AULICINO") is for all times relevant to this Complaint a licensed anesthesiologist in the State of

Michigan and is employed with TAA and PHYMED, is a shareholder in TAA and is the President of TAA and works and resides in the Western District of Michigan.

16.     Defendant Frederick CAMPBELL, M.D. (hereafter "CAMPBELL") is for all times relevant to this Complaint a licensed anesthesiologist in the State of Michigan and is employed with TAA and PHYMED, is a shareholder in TAA and is the Compliance Officer of TAA and works and resides in the Western District of Michigan.  Defendant CAMPBELL is married to Denise CAMPBELL who is, for all times relevant to this Complaint TAA's practice administrator.

17.     Defendant Edward VOMASTEK, D.O. (hereafter "VOMASTEK") is for all times relevant to this Complaint a licensed anesthesiologist in the State of Michigan and is employed with TAA and PHYMED, is a shareholder in TAA and was the Chief of Anesthesiology for TAA until June 2018 and works and resides in the Western District of Michigan.

18.     Defendant Brian KIESSLING, M.D. (hereafter "KIESSLING") is for all times relevant to this Complaint a licensed anesthesiologist in the State of Michigan and is employed with TAA and PHYMED, is a shareholder in TAA and works and resides in the Western District of Michigan.

19.     Defendant Timothy Esser, M.D. (hereafter "ESSER") is for all times relevant to this Complaint a licensed anesthesiologist in the State of Michigan and

is employed with TAA and PHYMED, is a shareholder in TAA and works and resides in the Western District of Michigan.

20.     Defendant Matthew MARTIN, M.D. (hereafter "MARTIN") is for all times relevant to this Complaint a licensed anesthesiologist in the State of Michigan and is employed with TAA and PHYMED, is a shareholder in TAA and became the Chief of Anesthesiology for TAA on or about June 2018 and works and resides in the Western District of Michigan.

21.     Defendant Robert "David" Denyer (hereafter "DENYER") is for all times relevant to this Complaint an <u>unlicensed</u> certified anesthesiologist assistant in the State of Michigan and is employed with TAA and PHYMED and works and resides in the Western District of Michigan.

22.     Defendant Cynthia Rankin (hereafter "RANKIN") is for all times relevant to this Complaint an <u>unlicensed</u> certified anesthesiologist assistant in the State of Michigan and is employed with TAA and PHYMED and works and resides in the Western District of Michigan.

23.     Defendant Denise CAMPBELL (hereafter "D. CAMPBELL") is for all times relevant to this Complaint the Practice Administrator for TAA and PHYMED and works and resides in the Western District of Michigan.  D. CAMPBELL is married to Defendant CAMPBELL.

## GENERAL ALLEGATIONS

24.     This qui tam case centers on Defendants' illegal coding of anesthesia services, false billing for medical direction in violation of TEFRA, creating false entries in medical records, altering medical records, illegal use of unlicensed anesthesia assistants (AAs), including but not limited to allowing unlicensed AAs to access sole possession or custody, ordering of, selecting and administering, dispensing, accounting, and wasting of controlled substances, causing egregious harm to patients, and directing CRNAs to pad their time.

25.     TAA is a single specialty medical professional corporation that provides anesthesiology and pain management services at several hospital and outpatient sites in the Grand Traverse region, including:

    a.     Munson Medical Center;

    b.     Northwest Michigan Surgery Center;

    c.     Munson Comprehensive Pain Management Program at the Munson Community Health Center;

    d.     Paul Oliver Memorial Hospital; and

    e.     Kalkaska Memorial Health Center.

26.     TAA was "incorporated in Traverse City in 1968, and now employs 27 physicians, over 32 certified registered nurse anesthetists and certified

anesthesiologist assistants as well as a 3 member professional office staff." https://www.taapc.org/physicians-staff (last visited 12-9-18).[1]

27.     TAA provides comprehensive anesthesia and interventional pain management services in Northern Michigan.

28.     TAA holds itself out as a medically directed anesthesia practice.

29.     PHYMED is "a physician-led and owned anesthesia services leader with a focus on redefining perioperative partnerships." Further, its "clinicians create positive patient interactions before, during and after surgery as a trusted partner to healthcare systems, ambulatory surgery centers and office-based anesthesia with over 900 clinicians nationwide." https://www.phymed.com/about (last visited 12-9-18).

30.     PHYMED "delivers the benefits of a national organization with the intimacy and decision-making authority of a local practice. Retain your brand, and drive smart, growth and clinical excellence." *Id.*

31.     Per PHYMED's website, an entity that partners with it can expect the following:

[a.] OWNERSHIP

An equity stake as well as local practice growth bonuses.

[b.] COMPETITIVE ADVANTAGE

---

[1]TAA's website erroneously includes Relators as part of its staff. https://www.taapc.org/physicians-staff (last visited 12-9-18)

Leverage quality and technology to drive growth in local markets and quality outcomes.

[c.] MANAGEMENT RESOURCES

Support across all key business functions including recruiting, training, and revenue cycle management.

[d.] QUALITY OF LIFE

Find work life balance and practice at the top of your license without administrative burdens. https://www.phymed.com/practices (last visited 12-9-18).

32.    PHYMED's website touts that its success is achieved by "blazing new trails" and acknowledges that the "operating room is the financial heartbeat of any hospital organization. **To remain successful, they must deliver excellent care at the lowest possible spend[ing] while building volume.**" (emphasis added) https://www.phymed.com/perioperative-management (last visited 12-9-18)

33.    PHYMED provides, *inter alia*,

    [a.]    Integrated Proprietary EMR;

    [b.]    Just In Time Scheduling Optimization;

    [c.]    Analytics Platform Supporting Protocol Management;

    [d.]    Perioperative Surgical Home; and

    [e.]    Proprietary Risk Model and Engagement Tool

https://www.phymed.com/perioperative-management (last visited on 12-9-18).

34.     PHYMED promises that entities who enter in a relationship with it, can expect the following:

[a.]   MARGIN IMPROVEMENT

Through an optimized anesthesia footprint.

[b.]   CLINICAL EXCELLENCE

The analytics and clinical protocols necessary to ensure quality surgical experiences.

[c.]   OPERATIONAL EFFICIENCY

Data-driven strategies to optimize patient flow and OR time.

[d.]   PATIENT SATISFACTION

Proactive communication before, during and after surgery.

https://www.phymed.com/perioperative-management   (last   visited 12-9-18).

35.     On or about November 16, 2017, TAA joined PHYMED as its partner.

https://www.prnewswire.com/news-releases/traverse-anesthesia-associates-joins-phymed-healthcare-group-300557777.html   (last visited 12-9-18)

36.     Per PHYMED's press release announcing its partnership with TAA, PHYMED stated that "[t]hrough the partnership, PhyMed and TAA will be focused on providing its facility partners with innovative technology and quality reporting data to deliver the highest quality care and experience to their patients. **The**

**partnership will also enable TAA to expand its presence in the Michigan market to service the growing needs of healthcare facilities across the state. TAA, comprised of over 55 physicians and anesthetists, will continue to maintain its local leadership and provider base with the new partnership."** (emphasis added) https://www.phymed.com/news/press-release/912/traverse-anesthesia-associates-joins-phymed-healthcare-group (last visited on 12-9-18)

37.     Defendant AULICINO believes that TAA's partnership with PHYMED "… will allow us to continue to provide a high level of service to our patients and healthcare partners, while providing our practice with the necessary support and resources that will allow our practice to thrive in a dynamic healthcare environment…" and that "[w]e see strong alignment in both TAA's and PhyMed's commitment to delivery of the highest quality patient care, and we are excited to be joining PhyMed's exceptional group of providers." https://www.prnewswire.com/news-releases/traverse-anesthesia-associates-joins-phymed-healthcare-group-300557777.html (last visited 12-9-18)

38.     PHYMED has existing practice partnerships in Tennessee, Pennsylvania, Maryland and Kentucky. https://www.phymed.com/news/press-release/912/traverse-anesthesia-associates-joins-phymed-healthcare-group          (last visited 12-9-18).

## ANESTHESIA BILLING

39.     The concept of "medical direction" for anesthesia is based on the 1982 Tax Equity and Fiscal Responsibility Act ("TEFRA").

40.     TEFRA mandates that the anesthesiologist meet the following seven requirements in order to submit a valid claim for reimbursement under Medicare Part B medical direction.

41.     TEFRA's seven requirements for billing anesthesia services are:

a.      performed a preanesthetic examination and evaluation (which requires the anesthesiologist to personally perform an exam and evaluation prior to the anesthetic session. It is not sufficient to simply to document that an exam was performed. The specific system(s) or body area(s) examined and the findings also must be documented.);

b.      prescribed the anesthesia plan (the anesthesiologist must personally decide on the appropriate anesthetic for the specific procedure (e.g., general anesthesia, regional block, monitored anesthesia care, etc.), and he/she must document that decision.);

c.      personally participated in the most demanding procedures in the anesthesia plan, including induction and emergence (the anesthesiologist must be in the room and _must_ participate in induction and emergence when those are elements of the service provided. If the service has other demanding aspects, depending on the type of anesthesia, the anesthesiologist _must_ be in the room during those services and must document his or her presence and participation. When the anesthesiologist cannot be in the room for one of these "most demanding" elements of the case, he or she cannot bill for medical direction (or the entire case);

d.      ensured that any procedures in the anesthesia plan that he or she did not perform were performed by a qualified anesthetist. (There

are no specific special documentation requirements for this element, but the anesthesiologist is required to know that everyone who participates in the anesthesia care is qualified to perform the service. Everyone who participates in the service must sign into the case, appending his or her license or certification, e.g. M.D., CRNA or AA);

e.     monitored the course of anesthesia administration at frequent intervals (the anesthesiologist is not required to be in the room for the entire case, but he or she must provide appropriate monitoring throughout the case. <u>Monitoring means actual presence in the room where anesthesia is being administered.</u>);

f.     remained physically present and available for immediate diagnosis and treatment of emergencies (in order to satisfy the medical direction requirements, an anesthesiologist cannot be personally providing anesthesia care or handling other services that take more than a few minutes, or that take him or her out of the immediate area where the anesthesia services are being provided. There are a limited number of services that can be performed without breaking the medical direction rule to remain present and available during the case, including: addressing an emergency of short duration in the immediate area, administering an epidural or caudal anesthetic to ease labor pain, periodically (rather than continuously) monitoring an obstetrical patient; receiving patients entering the operating suite for surgery, checking on or discharging patients in the recovery room,  and handling scheduling matters. If the physician leaves the immediate area of the operating suite for other than short durations, devotes extensive time to an emergency case, or is not otherwise available to respond to the immediate needs of the surgical patients, his/her services to the surgical patients are supervisory in nature and must not be billed as medical direction.; and

g.     provided indicated post anesthesia care (Anesthesia services continue to run, and the anesthesiologist remains responsible for the patient, until the care of the patient is transferred to another caregiver. The anesthesiologist should document any services performed during post-anesthesia time, especially if the patient

requires more care due to adverse reactions. Even if the patient is doing fine, the anesthesiologist is expected to document, at a minimum, that the patient is safe to transfer to someone else.

42.    The anesthesiologist who is billing for medically directed services must personally document the seven TEFRA requirements.

43.    TEFRA is not satisfied if the anesthesiologist billing for medically directed services has someone else document that the anesthesiologist did the work or was present.

44.    Anesthesiologists are barred from documenting the required TEFRA information <u>before</u> the service is performed.

45.    The TEFRA medical direction rules apply when an anesthesiologist works with one to four other qualified providers in overlapping cases. If more than four cases overlap, even for a single minute, the anesthesiology service is considered to be medical supervision, and not medical direction.

46.    Anesthesia billing under Medicare Part B is calculated by the anesthesia base units plus anesthesia time units multiplied by the conversion factor.

47.    The manner by which entities bill Medicare Part B affects the total facility costs for anesthesia services.

48.    Under Medicare Part B billings are submitted by either a CRNA or an anesthesiologist, and on rare occasions by an anesthesiologist assistant; only when he/she is working under the direction of anesthesiologist.

49.    Reimbursement under Medicare for anesthesia is unique from other medical services because of its own fee schedule and billing modifiers which dictate the anesthesiologist's level of participation.

50.    The Centers of Medicare and Medicaid Services (hereafter "CMS") "Claims Processing Manual" provides detailed direction on how CRNAs and anesthesiologists must bill their services. *Medicare Claims Processing Manual.* Baltimore, MD:Centers for Medicare and Medicaid Services; Rev. 4068, 05-31-18):chap12.https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf (last visited 12-15-18).

51.    Under TEFRA, payment for CRNA services performed under a medically directed rate, results in an allocation of 50% of the reimbursement for the allowed service so long as the as the anesthesiologist attested to and documented in the anesthesia record that the seven TEFRA requirements were met.

52.    The process used to inform Medicare whether TEFRA's medical direction requirements were met is through the use of specific anesthesia billing modifiers; that is, specifically, modifiers QK and QY.

53.    When medical direction is not met, then other modifiers must be used; that is, where the CRNA is not medically directed, he/she must use the QZ modifier when billing Medicare.

54.     Anesthesiologist assistants (hereafter "AA") cannot use the QZ modifier.

## STONE

55.     In 2009, Relator STONE, completed his training as a CRNA.

56.     Shortly after completing his CRNA training, Defendant KIESSLING recruited STONE to work for TAA.

57.     On or about January 2, 2011, STONE commenced his employment with TAA in the position of CRNA.

58.     From on or about January 2, 2011, until his retaliatory termination on September 25, 2018, STONE rarely received medical direction from Defendants TAA, PHYMED, AULICINO, CAMPBELL, VOMASTEK, D.O., KIESSLING, and ESSER.

59.     From on or about January 2, 2011, until his retaliatory termination on September 25, 2018, STONE interviewed the patient, formulated an anesthesia plan, brought the patient to the operating room and anesthetized the patient for his/her surgical procedure.   During the key phases of the anesthetic: Induction, Maintenance, and Emergence, STONE would rarely if ever encounter the assigned medically directing anesthesiologist.

60.     From on or about January 2, 2011, until his retaliatory termination on September 25, 2018, STONE, like all of the CRNAs employed with TAA, was

required to sign over his individual billing rights to the corporation, allowing TAA to bill on his behalf and on behalf of the other CRNAs. TAA kept all monies received by payment from insurers, including Medicare, Medicaid and other federally funded insurance programs.

61.    On or about 2011, STONE began observing the medically directing anesthesiologist sorting through the anesthesia chart bin and removing STONE's completed anesthesia records on patients that were already discharged from the recovery room. STONE observed Defendant doctors annotating and back-signing the records to falsely indicate that they had complied with the seven mandatory TEFRA billing requirements.

62.    On or about late 2013 or early 2014, STONE gained some familiarity with TEFRA and the billing requirements under TEFRA.

63.    Beginning in late 2013 or early 2014, STONE began discussing with TAA's leadership Defendants, in general, the TEFRA requirements.

64.    Sometime in approximately mid-2014, STONE observed an increased presence of the anesthesiologists during the course of his work day, but these anesthesiologists rarely met the medical direction requirements under TEFRA and STONE estimates that medical direction compliance occurred in only roughly 25% of the cases.

65.     On or about July 16, 2014 STONE met VOMASTEK and AULICINO to address CRNA morale. During this meeting STONE asked how TAA billed for anesthesia services performed by the CRNAs. STONE was told that TAA bills for medical direction unless the conditions are not met. STONE then asked about the pre-signing of medical records by the anesthesiologists and told VOMASTEK and AULICINO, that the anesthesiologists were routinely signing the patients' medical records prior to the patient even being taken to the Operating Room (hereafter "OR").

66.     During this meeting, STONE offered to provide AULICINO and VOMASTEK a copy of an anesthesia form from his prior CRNA job in Virginia. This form incorporated a timeline and spot for the medical directing anesthesiologist to annotate on the timeline his/her presence for specific portions of the anesthetic case.

67.     AULICINO and VOMASTEK accepted STONE's offer of this form and STONE presented the form to them a few days later.

68.     In the immediate months after the July 2014 meeting referenced above, STONE observed that TAA modified its form for anesthesia to include the recommendations that he had offered in an effort to improve compliance with the requisite TEFRA documentation for the physician anesthesiologist.

69.     On or about July 16, 2014, during the CRNA's meeting with AULICINO and VOMASTEK, VOMASTEK announced to all present that CRNAs should take credit for their time spent with the patient by adding five (5) minutes to the beginning of the case (preoperative interview time) and adding five (5) minutes to the end of the case (PACU or recovery room time). VOMASTEK claimed that other departments were adding time to their charts, and that TAA was missing out on a billing opportunity to collect *actual time* with the patient that could amount to tens of thousands of dollars per provider per year.

70.     At the time VOMASTEK made these statements neither STONE nor MCKINLEY nor any CRNA, questioned these directives from leadership.

71.     Sometime after July 2014 to March 2015, STONE learned that VOMASTEK's directive to CRNAs to add time to their charts was illegal and not allowed under billing guidelines and that this practice was termed "padding your time."

72.     After STONE learned that the addition of charting five (5) minutes at the beginning and end of each case was illegal, STONE met with AULICINO and VOMASTEK and raised concerns about the illegality of billing for this padded time. AULICINO and VOMASTEK responded that they would get back to him on this topic, but they never provided him with a response.

73.     Thereafter, in approximately March 2015, STONE informed his CRNA colleagues at TAA about the information he learned about billing for illegally padded time.  STONE also told the CRNAs at TAA that they should use the billing modifier QZ on their charts if the anesthesiologist did not meet the requirements of medical direction.

74.     On or about May 13, 2015, TAA's leadership CAMPBELL, AULICINO, and VOMASTEK called a department meeting with all CRNAs. During this meeting, CAMPBELL, AULICINO, and VOMASTEK instructed the CRNAs to stop using the QZ modifier for billing in any portion of the patient's medical record to reflect that TEFRA billing requirements were not met by the anesthesiologist.

75.     On or about May 13, 2015, STONE and other CRNAs asked TAA's leadership what they used as a basis for this directive.  STONE and the other CRNAs were told by CAMPBELL, AULICINO, and VOMASTEK that the billing/coding personnel at TAA would be responsible for the record review and would determine the appropriate billing codes to be applied for each case.

76.     During this time period, TAA's billing of all its anesthesia cases was performed by an internal TAA employee designee/biller/coder.

77.   Shortly after the May 2015 meeting, TAA created a system to facilitate the false billing of cases as medically directed cases under TEFRA through its use of the "dirt ball" accordion file folder.

78.   The "dirt ball" file folder is an accordion type file folder labeled with all providers' initials. Office personnel placed patients' records for each provider to address missing items, to correct the record and then return the "fixed" record back to the billing office.

79.   From the inception of the "dirt ball" file folder in about May 2015, it was used daily for records that did not meet medical direction compliance by the physician anesthesiologist.  The "dirt ball" file system was designed to allow the anesthesiologist to back-sign and back-date a completed anesthesia record.

80.   The "dirt ball" file folder system of circulating records from the billing office back to the anesthesiology office for the physicians to "correct" records where the record did not include the requisite information to support  billing for medical direction was a mechanism designed to knowingly subvert the billing system by falsely altering patients' anesthesia records to include physicians' signatures and/or initials attesting to meeting the mandated medical direction requirements under TEFRA.

81.   On or about May 13, 2015, and dates thereafter, STONE questioned CAMPBELL, AULICINO, and VOMASTEK why CRNAs were no longer able to

annotate QZ on their records, VOMASTEK and AULICINO, told STONE that "we [TAA] are a medical direction practice and will bill medical direction."

82.     On or about May 14, 2015, CAMPBELL showed STONE an article entitled *Billing for Anesthesia Services and the QZ Modifier: A Lurking Problem*, The American Society of Anesthesiologists Journal, June 2011 Vol. 75, No. 6 p. 36-38.  The article espoused CAMPBELL's point of view that recommended, contrary to the law, that CRNAs should not be permitted to use the QZ modifier, because this modifier suggested that CRNAs were capable of performing care independent of the anesthesiologist or outside of the care team model.

83.     On or about May 17, 2015, CAMPBELL sent an email to all of TAA's CRNAs detailing his lobbying efforts on Michigan's Senate Bill 320, which if passed would remove the mandatory physician supervision of CRNAs to allow the unrestricted and unsupervised practice of CRNAs.

84.     In addition, CAMPBELL's email of May 17, 2015, also opined that if SB 320 became law, many physician anesthesiology practices would move to hire AAs in lieu of CRNAs.

85.     On or around May 2015, and for the next roughly year and one-half, STONE had nearly weekly formal meetings with AULICINO and VOMASTEK regarding TAA's goal to employ AAs in its practice, billing and compliance issues related to this staffing goal.

{H0606391.1}                                     23

86.     In June 2015 STONE's CRNA peers unanimously selected him as the Chief CRNA to serve as their representative and act as the conduit for communication and representation between the CRNAs and the physician shareholder leadership of TAA.

87.     On both June 10 and June 24, 2015 TAA leadership called a meeting with STONE to formally discuss the hiring of AAs. During these meetings, STONE outlined the concerns of the CRNAs regarding AA practice at TAA, which included: the differences in educational training, limitation of QZ billing, unlicensed to practice in the state of Michigan, that AAs must clinically function only under physician medical delegation, AAs' limitation or exclusion by law from handling, accounting for, selecting, administering, distributing, and wasting of controlled substance medications.

88.     On or about July 14, 2015 STONE met with AULICINO to try to solve the faltering level of morale in the CRNA department regarding AAs.  STONE outlined the legal issues again regarding compliance and TAA's directive not to bill QZ for failed medical direction of the AAs.  During this meeting, AULICINO informed STONE that if medical direction was broken with AAs then "TAA simply would not bill for that case."

89.     STONE asked AULICINO whether he thought it was okay to simply not bill for an anesthetic delivered when TAA could bill QZ for a CRNA and he

asked what percent of the cases are currently billed QZ with the CRNAs? AULICINO responded that approximately 10% of cases are billed at QZ but we are a 100% medically directed practice.

90. STONE told AULICINO that realistically approximately 50% of all the anesthesia cases at TAA should be billed QZ due to the anesthesiologists' failure to comply with TEFRA.

91. AULICINO asked STONE how he knew about TEFRA and he wanted to know what STONE specifically knew about the law. STONE responded that he attended lectures, read journal articles and networked with peer providers to gain this knowledge.

92. At the close of the July 2015 meeting, AULICINO stated that there will be no issues with AAs and they will meet all compliance regulations and that the CRNAs should not concern themselves with this issue because they were not involved with the billing process.

93. On or about July 28, 2015 STONE had a discussion with AULICINO regarding a phone call that was made by a CRNA colleague to the business office inquiring about QZ billing. Specifically, Stacey Devries, CRNA called the TAA's billing office on July 25, 2015 and spoke with Cassey Lewis (administrative assistant) and Shelley Potvin (biller). During this meeting, AULICINO asked STONE why the CRNAs are so interested in billing and advised him that they should

be calling him or VOMASTEK and not the billing office. STONE then asked AULICINO if a CRNA submits a record with QZ annotated why is it being changed at the office to be billed for medical direction? AULICINO, angered, stated that the billing office is the authority and expert on compliance and medical direction requirements and that TAA will rely on the billing office to make the correct billing submissions. STONE also told AULICINO "If a chart is changed or back signed after the fact or after case completion then this would be considered fraudulent when it should be billed as QZ." AULICINO asked if charts were being changed and back signed, and STONE responded in the affirmative noting that several TAA CRNAs were complaining about this problem.

94. On or about August 6, 2015 TAA held another meeting with TAA physicians and CRNAs regarding bringing AAs to TAA's practice. During this meeting, the CRNAs reiterated their concerns with AAs regarding billing and compliance and they stated that AAs are not legally allowed to bill using the QZ modifier. The CRNAs also raised concerns about TAA's delegation of authority to AAs to write orders in the recovery room and to receive the delivery of controlled substances. TAA's leadership was dismissive of the CRNAs' concerns.

95. On or about October 14, 2015 STONE attended a morning meeting with AULICINO, ESSER, and Jennifer Daniel, CRNA regarding staffing issues, AA practice, spinals being performed by anesthesiologists in preop, and the pre-signing

of anesthesia records by TAA's anesthesiologists. STONE reminded AULICINO that he told the CRNAs that they could always come to him to report issues regarding clinical practice and compliance. STONE then reported that he personally observed, and that he also had received many reports from his CRNA colleagues, that many anesthesiologists were pre-signing anesthesia records in preop **prior** to the patient going to the OR. AULICINO responded that he would talk with the anesthesiologists and inform them that this practice needs to stop.

96. During the October 14, 2015, meeting, STONE also reported to AULICINO that spinal anesthetics were frequently being performed in the preop area by the anesthesiologist who is also medically directing other cases. STONE specified that the concern with this procedure is that an anesthetic is being performed by an anesthesiologist while concurrently medically directing other rooms/cases. STONE further advised AULICINO that the more egregious issue and one involving serious patient safety is that patients have been found by CRNAs in preop with the spinal already placed and **the patient not being monitored by any provider**.

97. STONE reported to AULICINO on or about October 14, 2015, that on several occasions CRNA staff found patients with symptomatic hypotension (severely low blood pressure) secondary to the intentional sympathectomy induced by the spinal anesthetic. STONE stated that these patients required immediate pharmacological rescue intervention by a CRNA to restore physiologic homeostasis.

AULICINO agreed with STONE that this practice was grossly inappropriate and must cease immediately. AULICINO noted that TAA was being pressured by the OR administration to reduce turnover times between cases and to place spinals preoperatively. Kathy Boyd, CRNA and McKINLEY were asked to sign anesthesia records attesting to their presence during a spinal performed in the preoperative area by a medically directing anesthesiologist. Boyd and McKINLEY told STONE about these requests and they told him that they were giving anesthetics to other patients when they were being asked to falsely attest to their presence for a spinal done in pre-op. STONE also reminded AULICINO that it is not ever appropriate to request that a CRNA sign the anesthesia record indicating that they were there and present for the spinal being performed in preop by the anesthesiologist alone. AULICINO initially replied that this is not a big deal and that we (TAA) are simply trying to fly under the radar with Munson and do what we are asked.

98. On or about December 14, 2015, TAA's physician leadership called a meeting with all CRNAs to discuss a "VOICE" regarding spinals being performed in preop by anesthesiologists.

99. A VOICE report is an internal reporting mechanism to allow the anonymous reporting of errors, near misses, and issues or concerns with patient care.

100. During the December 2015 meeting, VOMASTEK encouraged improved communication between providers and to limit use of the VOICE system

**because it draws unnecessary attention to TAA.**   However, there was no effort by VOMASTEK to limit or terminate the performance of spinals in preop or to ensure a proper handoff of the patient coming out of the OR to another provider.

101.   On or about the week of February 15, 2016, STONE contacted Mr. Andrew Brisbo, Director of the Licensing Division of LARA to follow up on information he received from CRNA colleague Jonnie Vanederhoff regarding TAA's anesthesiologists' delegation to or delivery of controlled substances by an unlicensed person in Michigan.  Mr. Brisbo advised STONE that there is no legal provision allowing controlled substance delegation to or delivery by an unlicensed person in the state of Michigan.  Mr. Brisbo further stated that controlled substance medication delivery and administration may only be delegated to licensed health providers such as Physician's Assistants, Nurse Practitioners and CRNAs in the operation room environment.

102.   On or about February 17, 2016 STONE met with AULICINO and ESSER to discuss ongoing concerns with spinal anesthetics being performed in preop by anesthesiologists who then were requesting CRNAs to sign the anesthesia record attesting that the CRNAs were present when the spinal was administered, when they were not.  CRNAs refused to sign a false anesthesia medical records because they were actually caring for another patient at the time the spinals were administered.  STONE informed AULICINO and ESSER that this is an egregious

breach of patient care and billing and must stop and he reiterated the concern that anesthesiologists were continuing to pre-sign anesthesia records in preop. STONE informed AULICINO that many CRNAs did not feel comfortable in approaching CAMPBELL, TAA's Compliance Officer, because of he was lobbying on behalf of AAs and moving to limit the scope of CRNAs' practice. AULICINO told STONE that he has heard concerns about CAMPBELL's bias many times and told STONE to continue to bring compliance issues to him and VOMASTEK.

103. On or about March 3, 2016 AULICINO confronted STONE that CRNAs were discussing AAs coming to the practice. STONE, MCKINLEY and the other CRNAs were threatened for discussing issues in the workplace specifically regarding the addition of unlicensed AAs to TAAs' practice.

104. On or about March 15, 2016 AULICINO called STONE and told him that there was a mandatory compliance educational training that evening after work and encouraged STONE to get all CRNAs to attend the training. During this call, AULICINO asked whether STONE knew if MCKINLEY had copies of patients' records that showed fraudulent billing. STONE told him that he did not know if MCKINLEY had records showing TAA's fraudulent billing. AULICINO told STONE that MCKINLEY was making "X" marks on patients' charts when no anesthesiologist was present to prevent them from altering the medical records at later time, by back signing the record to falsely indicate that they were present.

AULICINO informed STONE that MCKINLEY's conduct was inappropriate and that she must stop doing this. STONE informed AULICINO that they had brought these concerns to him and VOMASTEK several times and the activity of back-signing records by the medically directing anesthesiologist continues. AULICINO asked STONE directly if anyone is talking about reporting the violations to CMS. STONE told AULICINO he heard CRNAs discussing the notion of reporting this to CMS because of illegal conduct including the continued actions of pre-signing records, spinals in the preop. STONE asked AULICINO if the compliance education meeting was being scheduled in response to his recent discussions with him regarding the pre-signing of records. AULICINO responded that the education is mandatory for everyone that is doctors and CRNAs.

105. On or about March 17, 2016 McKINLEY was called into a meeting with AULICINO and VOMASTEK, *see infra*, (regarding the details of this meeting in the MCKINLEY section). AULICINO informed STONE of the McKINLEY meeting after it occurred, and STONE asked him why he was not present as the Chief CRNA. AULICINO responded that he did not think that STONE needed to be there, and he told STONE to tell the CRNAs that they should not be making marks on the record to block off areas of medical direction signature. STONE informed AULICINO that he would pass this information on to the CRNAs.

31

106.  On or about the end of March 2016, three full-time CRNAs resigned from TAA.

107.  On or about March 21, 2016, TAA's first AA, DENYER, began full-time practice.

108.  On or about March 22, 2016 STONE met with AULICINO before work to discuss CRNA morale.  AULICINO told STONE that the next person that mentions the topic of AAs would be terminated and that he had lost all patience in discussing the issue, stating TAA had made its decision about the use of AAs, and that TAA will stand behind it.  AULICINO said that if any CRNA is not happy with it then they can resign their position with TAA.  AULICINO also commented that he heard that CRNAs were interested in approaching Munson's hospital administration to discuss the practice of AAs.  AULICINO told STONE that any CRNA who approached Munson's administration to discuss any internal issues regarding TAA would be terminated immediately.  STONE told AULICINO that he would pass this information on to the CRNA membership.

109.  On or about March or April 2016 STONE along with several CRNAs had discussions with the clinical OR pharmacist Jennifer Sterling.  Jennifer Sterling was responsible for the preparation, accountability, and distribution of controlled substance medications to OR personnel including CRNAs and physicians.  Sterling advised STONE that she had addressed concerns of providing AAs access to and

32

distributing of controlled substances, because of their unlicensed provider status. Sterling informed STONE that she brought her concerns regarding AAs access to and distribution of controlled substances to the head of Anesthesiology, and to her superiors and she was ultimately directed to allow the distribution of controlled substances to AAs in violation of the law.

110. During the first two weeks of DENYER's employment with TAA, an anesthesiologist was required to check out the controlled substance medication kit from the Pyxis system because DENYER was initially denied access to this medication as an unlicensed provider by pharmacy.

111. During DENYER's initial two weeks of work, STONE observed on several occasions VOMASTEK checking out a controlled substance kit and providing it to DENYER in violation of the law.

112. After DENYER's initial two weeks of work, DENYER was given direct access to controlled substances.

113. Sterling acknowledged to STONE that she had been overruled in her protestations of this occurring and was forced to permit DENYER unrestricted access of controlled substances.

114. In the latter part of April 2016, Sterling resigned from her position and employment from Munson Medical Center. Sterling told STONE that the reason for her resignation was that she felt that she was being forced to illegally allow access

to and dispensing of controlled substances to an unlicensed provider, which put her own professional practice license at risk.

115.   Sterling informed STONE that she has received threats of bodily harm for her involvement in the controlled substance issue with DENYER

116.   On or about May 4, 2016, STONE reported patient safety concerns regarding DENYER to TAA leadership AULICINO and VOMASTEK.   STONE also told AULICINO and VOMASTEK about the continued poor morale and working relationship between the CRNAs and anesthesiologists.   STONE was informed that they would not be talking about AAs because AULICINO was tired of hearing about the issues and threatened termination for anyone who attempted the discussion.   STONE informed AULICINO that he was passing on some clinical related issues that were brought to him as the Chief CRNA and that multiple recovery room nurses and one surgeon complained of DENYER's unsafe clinical practices.   STONE provided three clinical examples of care issues that the recovery room registered nurses raised about DENYER's patients.   STONE advised AULICINO that he personally observed a patient in the recovery room with respiratory compromise secondary to opiate narcotic overdose.   This patient was provided high flow supplemental oxygen, and bi-manual airway assistance by providing a jaw thrust maneuver and placement of an oral pharyngeal airway.   Upon DENYER leaving the patient's bedside, STONE learned that the patient was

provided <u>250 micrograms of Fentanyl as a single injection in the recovery room.</u>
AULICINO dismissed STONE's concerns about DENYER and remarked that
people were just out to see him fail. STONE replied that this was not true and that
the concerns being raised are real and tangible. STONE also informed AULICINO
and VOMASTEK that he looked forward to meeting with them on May 9, 2016.

117. On or about May 4, 2016, STONE also questioned why DENYER, AA
was listed in TAA's computerized charting system "Powerchart" as a CRNA
provider. AULICINO replied that he was unaware that he was listed as a CRNA
with ordering and documenting privileges in the electronic patient medical records
system. STONE advised AULICINO that he was alerted to this issue by several
CRNAs and STONE showed him a picture of this on his phone sent to him by
another CRNA. AULICINO claimed that this was not important. STONE also told
AULICINO that DENYER was misrepresenting himself to preoperative and
postoperative care unit nurses as a physician's assistant or a CRNA. STONE also
told AULICINO that nurses in the preoperative area filed a complaint with LARA
regarding the misrepresentation/impersonation of a licensed healthcare provider.

118. On or about May 4, 2016, STONE also informed AULICINO that he
had received information regarding Michigan law MCL 333.17048 that states
delegation of controlled substance delivery could only be to a licensed individual.

AULICINO replied, in part, "do you really think we did not do our homework on this?" "There is no issue here so just drop it!"

119. On or about May 4, 2016, TAA physicians and the entire CRNA membership attended a meeting to address the extremely poor morale and to directly address the concerns related to the unlicensed practice of AAs, controlled substance delivery and accountability procedures and how to proceed if CRNAs and AAs were to give each other breaks or lunch breaks during patient care. Tom Wigton, CRNA was chosen as the spokesperson for the CRNAs at this meeting. The meeting concluded with a temporary resolution agreement with the CRNAs and anesthesiologists to proceed with an amicable working relationship. Following the meeting, VOMASTEK and AULICINO assured STONE that they would address the compliance issues that we have spoken about on several occasions with all of TAA's anesthesiologists at their next board meeting.

120. On or about May 10, 2016, STONE reported controlled substance delegation to unlicensed AAs to the Michigan Board of Pharmacy representative Eric Roath by phone consultation.

121. On or about May 26, 2016, Eric Palmquist, CRNA initiated a report to Michigan LARA (licensing and regulation authority) regarding the illegal practice of AAs at TAA.

122.   On or about June 8, 2016, STONE spoke with Mr. Perry Bell of LARA to follow up and submit a formal report and complaint regarding the unlicensed practice of AAs specifically handling, distributing, selecting and administering, prescribing, and accounting for controlled substances.

123.   On or about August 25, 2016, CAMPBELL informed the CRNAs that CRNAs would no longer be permitted to perform Post Anesthesia Notes, which is effectively signing a patient out of the recovery room following recovery from anesthesia.   Standard practice was for any provider that was available CRNA or anesthesiologist to perform the sign-out.   The CRNAs were informed that the rationale for this was because the AAs would not be allowed to perform this function and it created a disparity of practice between the CRNAs and AAs.   The CRNAs were also told that only anesthesiologists would be responsible for the sign out process that would fulfill the emergence requirement for TEFRA billing.

124.   On or about October 19, 2016, STONE met with AULICINO to discuss clinical practice issues for CRNAs regarding obstetrics and performance of regional anesthetics, and he asked why CRNA practice of performing regional anesthesia nerve blocks was being severely limited by the physician anesthesiologists. AULICINO informed STONE that because AAs will not be performing nerve blocks the CRNAs would likewise not perform them.   STONE reminded AULICINO he had promised nothing in the CRNAs' practice would change with the inclusion of

AAs into TAA's practice. STONE suggested that TAA create and include CRNAs into a "block team" where CRNAs coupled with a physician anesthesiologist would provide obstetrical care coverage and perform regional nerve block services for the orthopedic cases of the day.

125.   On or about November 3, 2016, STONE met with Greg O'Dell, CRNA, AULICINO, and VOMASTEK to discuss obstetrical practice and regional nerve block procedures, because many CRNAs requested additional exposure to obstetric anesthesia so they would feel clinically comfortable and competent when covering OB on their call weekends. Several CRNA providers including STONE regularly performed ultrasound guided regional nerve block procedures as an included skill set, component, and credentialed privilege of clinical practice. AULICINO and VOMASTEK informed STONE and O'Dell that effective immediately CRNAs would no longer be allowed to perform nerve blocks at TAA and that they rejected the formation of a CRNA block team with more routine coverage of obstetrical anesthesia.

126.   On or about December 7, 2016, TAA's Executive CRNA committee members Jennifer Simons and Christy Pryde attended the TAA Board meeting in STONE's absence and reported back to the CRNA membership that CRNAs are not to separate the anesthesia records so that the physician anesthesiologists can later sign to comply with medical direction.

127. On or about January 2017, Michelle Witkop, PhD, APRN, and chair of the Advanced Practice Registered Nurse Council for Advanced Practice Providers at Munson Medical Center contacted STONE. Witkop invited STONE to participate and provide input on the medical staff hospital bylaws revision for advanced practice providers and to represent the approximately 27 CRNA members of TAA's department. STONE learned that KIESSLING was the chief architect responsible for the revision of both sets of bylaws (physician and advanced practice providers).

128. Beginning in early 2017, and over the course of the next several months, STONE provided feedback and suggestions to the APP Chair, Michelle Witkop.

129. In early April 2017, KIESSLING confronted STONE and asked him if he had received copies of revision changes to the APP bylaws. STONE told KIESSLING that he had received an email from Michelle Witkop recently. KIESSLING responded that he sent the revision to STONE as a courtesy and it was strictly a courtesy. KIESSLING moved toward STONE in an aggressive manner and told STONE the CRNAs would never have a voting member on the Medical Executive Committee. Witkop, the Chief Nursing Officer Ms. Lightfoot, and other administrators were aggressively advocating for the APPs to be included as a member of the MEC.

130.  STONE advised KIESSLING to move away immediately as he was imposing an immediate personal threat.

131.  The following day STONE called the medical staff office as well as the Human Resources office to discover how to report KIESSLING's violent actions and threatening demeanor.

132.  STONE was advised that these complaints get forwarded to the MEC and the Medical Staff President, which was KIESSLING.

133.  STONE reported KIESSLING's conduct to AULICINO on May 15, 2017.

134.  On or about March 2017, a CRNA pointed out to STONE an excel spreadsheet taped to the back of the door of the anesthesia behind the window blind office titled "physician QZ occurrence."  STONE asked VOMASTEK why this excel spreadsheet was there and he told STONE the department was monitoring each physician for the incidence of QZ cases tied to them.

135.  About one week later, the QZ sheet disappeared from the anesthesia office.

136.  On or about May 12, 2017, STONE received a phone call and text message from KIESSLING stating that he wanted to give STONE some "important advice" regarding the bylaw revision project.

137.   On or about May 15, 2017, STONE met with VOMASTEK to discuss a re-credentialing privilege request that was sent out to the CRNAs to sign and return to the TAA office.   STONE inquired about the credentialing changes and VOMASTEK informed him that he would not discuss the changes with him at this time and would be glad to discuss them when formal re-credentialing was again performed in October-November.

138.   Later that same day, STONE was called to a meeting with Cheri Morio, CRNA, AULICINO, and incoming anesthesia Department Chair MARTIN. AULICINO stated the CRNAs just needed to sign the forms.

139.   Several other topics were revisited regarding CRNAs and anesthesiologists (spinals in preop, pre-signing records, failed presence for induction, and forcing CRNAs to keep the anesthesia record together at the end of the case so they (anesthesiologists) could sign the entire record in the recovery unit. MARTIN remarked that "we are threatened by you" (CRNAs) from a practice perspective that clearly underlined the true intentions of the limitations of clinical privileges.   AULICINO told STONE to stay out of the bylaws issue because KIESSLING is angry. STONE told AULICINO about KIESSLING's conduct and that his harassment needed to stop.

140.   On or about May 17, 2017, STONE met with AULICINO regarding KIESSLING and his desire to terminate STONE.  STONE told AULICINO that he

would not tolerate the continued harassment, bullying, threatening, intimidating, physical threat of violence and unprofessional behavior any longer and that he was prepared to initiate a formal EEO Complaint and take this issue to the CEO of the hospital. AULICINO assured STONE that he would talk to KIESSLING to address his behavior and that no one was going to be fired.

141. On or about May 18, 2017, STONE submitted an anonymous complaint to the Medical Staff Office alleging bullying, threatening, harassing, and unprofessional behavior against KIESSLING.

142. On or about May 19, 2017, STONE submitted a formal letter to AULICINO detailing their discussions regarding KIESSLING's behavior.

143. On or about May 30, 2017, STONE met with many of the CRNAs at the home of Kristin Bauman, CRNA. This meeting was requested by the CRNAs because they were experiencing extremely poor morale. They discussed the pattern of behavior of pre-signing anesthesia records, spinals in preop, limitation of CRNA clinical practice, pre-documenting an anesthesia evaluation before the patient ever arrived to the preoperative area or hospital, asking CRNAs to sign a physician into the record for induction by phone, and back signing of records either in the OR, or in the recovery room by the medically directing anesthesiologist.

144. On or about June 16, 2017, STONE met with AULICINO to again discuss concerns of the CRNAs regarding the continued practice of pre-signing

records, performing preoperative anesthesia evaluations before the patient even arrives in preop holding, back signing of records, and the constant reminder to leave the anesthesia records together in the recovery room. STONE told AULICINO that CRNAs are not comfortable doing this and it is inappropriate for a CRNA to sign a physician anesthesiologist into the record for induction. AULICINO replied that "we (anesthesiologists) simply cannot make it to every single induction every single time and that we are available outside the room." AULICINO also commented on the no-traffic or locked OR door policy when performing orthopedic total joint replacements (knees, hips, shoulders, elbows, ankles, and plastic surgery breast implant cases and how difficult it was for them to make it into the room for every induction. AULICINO asked who was performing preop evaluations prematurely. STONE noted that KIESSLING and VOMASTEK were observed doing this most frequently, and that VOMASTEK frequently comments that he has all his preoperative evaluations done by 7:30 am for the entire day and boasts about how efficient he is. STONE reminded AULICINO that VOMASTEK would frequently hand STONE a stack of preoperative evaluations at the beginning of the day (before the patient's arrival to the hospital). AULICINO affirmed this action and said that he would talk with him. In the weeks following, STONE noted that KIESSLING stopped doing this and would not complete the preoperative evaluation until the patient actually arrived in the preoperative area.

145.   On or about June 16, 2017, STONE began to keep track of this practice to provide as evidence to AULICINO.   All preoperative evaluations are time stamped in the Powerchart electronic medical records system.   The time of arrival of the patient to the preoperative area is also time stamped in the OR Manager electronic system.   This information is also in the paper chart documented by the preoperative intake nurse preparing the patient for surgery.

146.   On or about June 20, 2017, STONE received a hand-delivered letter from AULICINO as a reprimand blaming STONE for not calling Dr. David Feenstra during an anesthesia case that occurred on June 19, 2017.   STONE opened the letter and read it in front of AULICINO.   STONE responded with "you have to be kidding, right."   AULICINO said that this is no joke and that they take medical direction compliance seriously.   STONE noted that he viewed this letter as retaliation for raising issues related to medical direction issue.   STONE asked if the other 27-member CRNAs would receive a similar letter from AULICINO, but AULICINO did not respond.

147.   On or about June 23, 2017, STONE sent an email update to all CRNAs regarding recent discussions with AULICINO and VOMASTEK and reiterated that CRNAs were not to mark any anesthesia records with the billing modifier "QZ" and that the billing office would be responsible for determination of the appropriate billing codes.

148.   On or about June 26, 2017, all hospital provider staff received an email from KIESSLING which contained an updated Medical Staff behavior policy and Code of Conduct in response to recently reported events/complaints.

149.   On or about June 29, 2017, STONE hand-delivered a letter to AULICINO dated June 28, 2017 responding to AULICINO's unwarranted discipline.

150.   On or about August 2, 2017, STONE attended the TAA Board meeting with Greg O'Dell, CRNA. The primary message to CRNAs was to leave anesthesia records together and a reminder that CRNAs are not to annotate "QZ" on any anesthesia record.

151.   On or about October 30, 2017, STONE and Cheri Morio, CRNA spoke with AULICINO prior to the evening scheduling meeting to inform him that STONE and other CRNAs were requesting how their anesthesia cases were being billed by TAA, how he could obtain his billing numbers and case counts. AULICINO informed STONE that he did not have any reason to have this information and that he would not provide it, as this information was the property of TAA. The topic of medical direction was raised by AULICINO and he stated that it is a team effort and that we all need to work together. STONE informed AULICINO that STONE and several CRNAs have raised this issue many times and that they wanted to do the

right thing.  AULICINO informed STONE that if he was going to report it to go ahead and they would deal with the fallout, pay the fines, and move forward.

152.   On or about October 30, 2017, STONE reported to AULICINO that anesthesiologists who are medically directing would provide a morning break to the CRNA in the room providing anesthesia (STONE included) and neglect or refuse to sign into the room for the period of coverage while the CRNA was on break.  STONE asked AULICINO why the doctors were not signing in and he replied, "because we are medically directing." STONE noted that he usually placed the initials of the medically directing physician on the provider signature line and noted the time that the break occurred.  This temporary "transfer of care" is standard throughout the practice.  It is necessary that any provider assuming temporary direct care of the patient while anesthetized must annotate their period of care on the anesthesia record by signing in and out of the record.  AULICINO responded that "it is not necessary for you to do this." STONE also told him that a couple of physicians would refuse to sign into the anesthesia record when providing STONE with a 30-minute lunch relief break.  AULICINO informed STONE that he has heard this complaint before and that he would speak with Dr. Munro, the primary offender.

153.   On or about November 20, 2017, STONE returned from vacation to find that the CRNA re-credentialing privileges were handed out to the CRNAs while he was on vacation and they were told that they were to be returned within the week.

STONE spoke with VOMASTEK to inquire why specialty privileges (peripheral nerve blocks, IV regional anesthesia, and Epidural placement) were completely removed from CRNAs' credentialing privileges. VOMASTEK replied that this is what TAA decided and if STONE did not like it then he can leave. STONE replied to VOMASTEK that these are core privileges to every CRNA and at many facilities CRNAs are expected to be able to provide these procedures as a condition of employment and informed him that TAA's neighboring hospitals in Cadillac and Charlevoix both require CRNAs to perform these procedures. VOMASTEK replied "well, you can go work there then."

154. STONE and several other CRNAs hand wrote their privileges in the free text column areas of the document for submission to the medical staff office.

155. Thereafter, STONE learned from the Medical Staff office that all of his requested privileges were denied by VOMASTEK.

156. On or about December 18, 2017, STONE was called to a meeting with AULICINO and VOMASTEK. Christy Pryde, CRNA was available to attend as a witness. During this meeting, STONE was removed as the Chief CRNA and he was told that it simply was not in the best interest for him to continue as the CRNA leader.

157. On or about January 29, 2018, CAMPBELL forwarded an email memorandum to CRNAs advising them that CRNAs would be restricted from placing orders for patients in the recovery room.

158.   On or about March 21, 2018, STONE spoke with an investigator at LARA regarding submission of reporting violations.

159.   In April 2018, KIESSLING approached STONE about STONE annotating the comments section of the anesthesia record when he actually reported to the room for induction and emergence.

160.   STONE observed that it was common for KIESSLING and others to falsify their presence on the timeline of the record by indicating they were there at the designated induction and emergence periods when they were not present at these times.

161.   In May 2018, AULICINO approached STONE and asked him about the separation of an anesthesia record on a patient that he delivered to the recovery room. STONE informed him that he did indeed leave the record together for him, as directed in the recovery room. AULICINO informed STONE that he could not find the yellow sheet (billing copy) in the recovery room. STONE informed him to check with the nurse and the patient because the patient had likely already been transferred to phase two of recovery (a separate area). AULICINO brought back the billing sheet to STONE's operating room to tell him that he found it with the patient. STONE asked him for an apology for wrongly accusing him of separating the record.

162.   On or about June 1, 2018, STONE submitted a VOICE internal report against DENYER after he observed a syringe containing clear liquid labeled fentanyl

was found unattended in the male locker room on the bench lying next to a pager and skull cap. The pager was identified as belonging to DENYER. An OR administrator, Dr. Walt Noble was immediately notified of the discovery and he took possession of the labeled controlled substance.

163. On or about July 13, 2018, AULICINO and MARTIN met with STONE and STONE was asked about whether he was asking a CRNA if spinal blocks were continuing to be performed in the preoperative area by medically directing anesthesiologists.

164. On or about August 21, 2018, during an anesthetic procedure, AULICINO entered STONE's room while he was busy attending to a patient. STONE observed him look through some of his papers and personal notes on STONE's anesthesia cart. STONE had a note card with documentation of specific instances of failed medical direction which included the date, medical record number, and No PFI (presence for induction) /back signed/ or pre-signed and initials of the medical directing anesthesiologist. AULICINO asked STONE about the note card and stated "I see you are taking notes." STONE told AULICINO that the continued practice constitutes violation of compliance with medical direction billing procedures. AULICINO asked STONE what he intended to do with this information. STONE replied that he had not yet decided to report, but it may be the only way for effective change.

165. On September 25, 2018, AULICINO called STONE to a meeting. STONE was handed a notice of termination effective immediately and was told that TAA felt that STONE was unhappy there and did not enjoy the medical direction model of practice.

166. DEFENDANTS TAA and PHYMED's termination of STONE was done in retaliation for protected activity under the False Claims Act.

167. On September 26, 2018, STONE was scheduled to work in Charlevoix. Ken Forrester, CRNA and Chief of Anesthesia Services at Charlevoix Hospital told STONE that the hospital received an email from Ms. Lattimer of PHYMED / TAA instructing the hospital to terminate his privileges at all Munson facilities effective immediately. Neither TAA nor PHYMED had professional practice rights or employment contracts at the facilities where STONE was employed.

168. PHYMED and TAA's directive to terminate STONE's privileges at all Munson facilities was done in retaliation for STONE's protected activities under the FCA.

### McKINLEY

169. McKINLEY started working for TAA as a CRNA in July 2006.

170. On or about July 16, 2014, VOMASTEK told McKINLEY to add 5 minutes to the beginning and ending time of each anesthetic time for preop interview time and PACU/Recovery room handoff. STONE later informed McKINLEY that

this practice was illegal and instructed several CRNAs, including McKINLEY not to do it.

171. On or about May 13, 2015, McKINLEY was told that CRNAs can no longer mark QZ on charts, and AULICINO, VOMASTEK and CAMPBELL told the CRNAs that the billing/coding office staff would determine the codes.

172. McKINLEY observed the anesthesiologists often go through separated anesthetic records to put them back together to back sign them to meet billing requirements.

173. On or about November 23, 2013, McKINLEY became aware of the "dirt ball" folder system that was also used for doctors missing medical direction requirements. A list was printed off by the office staff for missing initials/signatures needed to meet medical direction requirements.

174. On or about May 17, 2015, McKINLEY received an email from CAMPBELL who was President of the Michigan Society of Anesthesiologists at that time and is the wife of D. CAMPBELL, the TAA Office Manager. CAMPBELL's email outlined his involvement in opposing SB 320, described above.

175. In June 2015, the CRNAs, including MCKINLEY voted for STONE to serve as their Chief CRNA.

176.   On or about June 10 and June 24, 2015, McKINLEY observed that AAs were in discussions with TAA.

177.   On or about June 23, 2015, McKINLEY received an email from Glen O'Connor of Michigan Association of Nurse Anesthetists (MANA) asking if TAA asked her to contact MANA to stop SB 320.

178.   On or about July 16, 2015, McKINLEY learned that AAs have no prescriptive authority or ability to handle controlled substances because they are non-licensed and uninsurable without co-signature.

179.   On or about July 18, 2015, McKINLEY received an email from Eric Palmquist, CRNA regarding billing and liability.

180.   On or about July 20, 2015, MCKINLEY emailed with Sarah Chacko at AANA (Assistant Director of State Government Affairs and Legal) regarding the scope of AAs' role.

181.   On or about July 21, 2015, McKINLEY spoke with Sarah Chacko regarding AAs and the scope of practice.

182.   On or about July 21, 2015, McKINLEY had a follow-up email with Sarah Chacko regarding information about AAs.

183.   On or about July 23, 2015, McKINLEY received information regarding TEFRA Supervision requirements from TAA which contained misinformation regarding CRNA/AAs.

184.   On or about July 24, 2015, McKINLEY received an email from Stacey DeVries, CRNA after she spoke with Cassey about TAA's billing practice stating that even if they marked a chart QZ, the billing office would review it and alter it to not bill QZ.

185.   On or about July 25, 2015, McKINLEY received emails regarding AULICINO threatening termination if he discovered any evidence of the CRNAs discussing the arrival of the AA with the OR staff.

186.   On or about July 28, 2015, AA DENYER was introducing himself as a "Physician Assistant of Anesthesia."

187.   On or about July 28, 2015, McKINLEY discussed DENYER's misconduct with MARTIN.  McKINLEY sent an email to TAA's CRNAs regarding DENYER calling himself a Physician Assistant of Anesthesia handling/wasting narcotics when he is NOT licensed by the State of Michigan Access to Pyxis giving narcotics, etc. without a doctor order losing money on cases when they do not meet 100% TEFRA which happened daily.

188.   On or about August 6, 2015, McKINLEY attended a meeting with TAA and CRNAs regarding billing and compliance.

189.   On or about August 21, 2015, McKINLEY submitted a VOICE report regarding one of the anesthesiologists having vials of medication in his locker.

{H0606391.1}                                                53

190.   On or about September 22, 2015, McKINLEY received an email from Eric Palmquist, CRNA and STONE stating, in part, "The Michigan Public Health Code prohibits a Physician from delegating prescription authority to an unlicensed individual." MCLA 333.17048.  The public health code prohibits a physician from delegating to an AA the task of selecting and ordering anesthetic agents – whether or not those agents are controlled substances.

191.   On or about October 6, 2015, CAMPBELL's editorial was printed in a Detroit paper wherein he tried to blame the opioid crisis on CRNAs.

192.   On or about December 14, 2015, McKINLEY submitted a VOICE regarding spinals being performed in preop by anesthesiologists.

193.   On or about December 14, 2015 McKINLEY observed Dr. Carmody giving Propofol to the patients for spinals or even blocks while medically directing other cases.

194.   On or about March 17, 2016, McKINLEY was called to a meeting with VOMASTEK and AULICINO.  She was not given an opportunity to get her Chief CRNA or any CRNA to accompany her.  During this meeting, McKINLEY was threatened with termination and was also told not to make "X" marks on the anesthesia record so the doctors could not back sign the charts.  They also accused her of having information regarding fraudulent practices by the TAA doctors.

195. On or about March 25, 2016, McKINLEY received Munson's Controlled Substance Handling MMC V8 060.046 via email. The policy highlighted that waste must be documented by <u>licensed</u> healthcare personnel.

196. On or about April 30, 2016, McKINLEY sent an email to the CRNAs regarding her meeting with VOMASTEK and AULICINO because they heard she had proof of fraudulent practices.

197. On or about August 25, 2016, CAMPBELL informed the CRNAs that the CRNAs would no longer be able to sign patients out of recovery.

198. On or about October 13, 2016, McKINLEY went off on medical leave and did not return to work until February 6, 2017.

199. On or about May 4, 2017, McKINLEY submitted a VOICE report done on VOMASTEK regarding a patient safety issue.

200. On or about July 24, 2017, McKINLEY observed that a patient was given Propofol for block by CAMPBELL while he was supervising AAs and CRNAs.

201. On or about August 2, 2017, TAA sent reminders to CRNAs, including McKINLEY not to separate the anesthesia records. This was done to allow doctors to back sign charts to avoid QZ.

202. On or about November 2017, CRNAs had to sign privileges that omitted blocks, epidurals, and other key procedures.

203. On or about November 20, 2017, McKINLEY received a page from Dr. Kerndt stating he was taking over medical direction and requested McKINLEY to sign him in on the chart.

204. Between April – June 2018, McKINLEY observed Dr. Kerndt giving a patient Propofol for a shoulder block. He was also medically directing. McKINLEY informed the nurse (Rachel) and the team leader (Macaire) that by giving that patient Propofol Kerndt was performing an anesthetic which he cannot do while medically directing. One of the AAs was present that day at the surgery center was also supposed to be medically directed by Kerndt as well.

205. McKINLEY also informed Christy Pryde as the Chief CRNA that this occurred about the incident in preceding Paragraph to this complaint. McKINLEY was later informed by Pryde that when she told AULICINO he said Kerndt only gave a small amount of the drug so the doctor's conduct was "fine."

206. On September 25, 2018, McKINLEY was terminated effective immediately.

207. DEFENDANTS TAA and PHYMED's termination of McKINLEY was done in retaliation for protected activity under the False Claims Act.

## FALSE CLAIMS

208. Relators observed Defendants engage in a variety of false claims including:

    a.     Improper coding and billing as it related to TEFRA requirements;

    b.     False modifiers added to billing codes for QZ claims resulting in the submission of false claims;

    c.     Falsification of medical charts, including: back signing, falsifying medication direction, requiring CRNAs to sign the anesthesiologists' names to the chart, Medicare, Medicaid and other government insurers;

    d.     Billing companies for services not provided to patients, including: falsely adding 5 minutes of time at the beginning and end of the anesthetic care; and

    e.     Maintenance of the "dirt ball" folder that was used to facilitate falsification of medical records that led to false billing.

209.    Relator STONE observed the following:

Relator STONE observed the following:

| Date | Medical Record # | Violation | Dr. |
|---|---|---|---|
| • 12-9-13 | 37-43-38 | No PFI/No PFE[2] Spinal done in preop Concurrent with medical direction | Martin |
| • 6-5-15 | 96-36-58 | No PFI/BS PFI No preop evaluation | AULICINO |
| • 6-5-15 | 96-36-49 | No PFI/No PFE False attestation | AULICINO |
| • 6-9-15 | 45-86-80 | No PFI | MACKE |

---

[2] PFI= Presence for Induction; PFE=Presence for Emergence; BS=Back Signed; PS=Pre-sign;  PSI=Pre-signed  Induction;  PSA=Pre-signed  Attestation; MON=Monitoring; BSE= Back Signed Emergence; ASC=Ambulatory Surgery Center (**Ex. 9**)

- 6-25-15   37-10-14   No PFI   KEITH
- 8-15-15   69-81-96   No PFI/No PFE   (no name in chart)
- 10-9-15   52-96-22   No PFI/BS PFI   MUNRO
- 10-9-15   67-20-16   No PFI/BS PFI   MUNRO
- 3-21-16   50-87-13   No PFI/BS PFI No PFE   AULICINO
- 4-20-16   93-77-57   No PFE   AULICINO
- 4-20-16   93-24-61   No PFE   AULICINO
- 7-12-16   96-50-41   No PFI/BS PFI/ PS PFE   AULICINO
- 7-12-16   926459   No PFI   AULICINO
- 7-12-16   831576   No PFI/BS BFI   MUNRO
- 7-12-16   489635   No PFI   MUNRO
- 7-20-16   772433   No PFI/BS PFI   STRATTON
- 7-20-16   245326   No PFI   SS[?]
- 7-28-16   481628   PS PFI   MUNRO
- 7-28-16   460560   No PFI/BS PFI   MUNRO
- 7-28-16   252897   No PFI/BS PFI   MUNRO
- 7-29-16   859447   No PFI/BS PFI   KURJAN
- 7-29-16   772433   No PFI/BS PFI   KURJAN
- 8-17-16   392491   Record PS   KIESSLING
- 8-17-16   396703   No PFI   KIESSLING
- 8-30-16   447457   No PFI/BS PFI   FEENSTRA
- 8-30-16   689645   Record PS   FEENSTRA
- 8-30-16   350998   Record PS   FEENSTRA
- 9-1-16   478643   No PFI   KYFF
- 9-1-16   713519   No PFI/No PFE   KYFF
- 9-1-16   352079   No PFI   KYFF
- 9-1-16   883624   No PFI/No PFE   KYFF
- 9-20-16   974769   No PFI/BS BFI No PFE   MCNULTY
- 9-20-16   389226   No PFI/No PFE   MCNULTY
- 9-20-16   351475   No PFI   MCNULTY
- 9-22-16   245852   PS PFI   AULICINO
- 9-22-16   461665   PS PFI No PFI, PS PFE No PFE   AULICINO
- 9-22-16   247178   PS PFI   AULICINO

|   | Date | Number | Status | Name |
|---|------|--------|--------|------|
|   |      |        | No PFI  |      |
| • | 9-23-16 | 627505 | No PFI/BS PFI<br>PS PFE/no PFE | MUNRO |
| • | 10-6-16 | 454571 | No PFI/BS PFI/no PFE | KYFF |
| • | 10-7-16 | 996339 | No PFI/BS PFI/no PFE | AULICINO |
| • | 10-7-16 | 995890 | PS PFE/NO PFE | AULICINO |
| • | 10-7-16 | 998291 | PS PFI/NO PFI/NO PFE | ESSER |
| • | 10-8-16 | 240495 | NO PFI/NO PFE | KEITH |
| • | 10-8-16 | 876611 | PS PFI/NO PFI | KEITH |
| • | 10-8-16 | 754769 | PS PFI/NO PFI | KEITH |
| • | 10-9-16 | 616031 | PS PFI/NO PFI | KEITH |
| • | 10-10-16 | 859788 | PS PFI/NO PFI | MUNRO |
| • | 10-10-16 | 652535 | PS PFI/NO PFI | MUNRO |
| • | 10-10-16 | 391338 | PS PFI/NO PFI | MUNRO |
| • | 10-14-16 | 972605 | PSI/NO PFI<br>NO PFE | KERNDT |
| • | 10-14-16 | 316102 | PSI/NO PFI/<br>NO PFE | KERNDT |
| • | 10-14-16 | 998673 | PSI/NO PFI/<br>NO PFE | KERNDT |
| • | 10-17-16 | 303098 | PSI/PS PFE | KYFF |
| • | 10-17-16 | 220413 | PSI/PS PFE/NO PFE | KYFF |
| • | 10-17-16 | 714811 | PSI/PS PFE/NO PFE | KYFF |
| • | 10-17-16 | 508440 | PSI/PS PFE | KYFF |
| • | 10-25-16 | 528291 | PS PFI/NO PFI | KERNDT |
| • | 10-25-16 | 910677 | PS PFI/NO PFI | KERNDT |
| • | 10-25-16 | 253629 | PS PFI/NO PFI | KERNDT |
| • | 10-25-16 | 694717 | PS PFI/NO PFI | KERNDT |
| • | 10-25-16 | 817041 | PS PFI | FEENSTRA |
| • | 10-26-16 | 883783 | NO PFI/BS PFI<br>NO PFE/BS PFE | KYFF |
| • | 10-26-16 | 640833 | NO PFI | KYFF |
| • | 10-26-16 | 937112 | NO PFI/BS PFI | KYFF |
| • | 10-26-16 | 960113 | NO PFI | KYFF |
| • | 10-27-16 | 999687 | PSA/NO PFI<br>BS PFI | VOMASTEK |

- 11-1-16    998481    PS PFI/NO PFI    KERNDT
- 11-1-16    745896    PS PFI/NO PFI    KERNDT
- 11-1-16    510321    PS PFI/NO PFI    KERNDT
- 11-1-16    305047    PS PFI/NO PFI    KERNDT
- 11-2-16    999538    NO PFI/BS PFI    VOMASTEK
- 11-2-16    891646    NO PFI/BS PFI    VOMASTEK
             NO PFE
- 11-2-16    881030    PS PFI/PS PFE    VOMASTEK
             NO PFI/NO PFE
- 11-2-16    754633    NO PFI/BS PFI    VOMASTEK
- 11-2-16    960198    NO PFI    VOMASTEK
- 11-3-16    720931    PS PFI/NO PFI    KIESSLING
             PS PFE/NO PFE
- 11-3-16    301189    PS PFI/NO PFI    KIESSLING
             PS PFE/NO PFE
- 11-3-16    992597    PS PFI/NO PFI    KIESSLING
             PS PFE/NO PFE
- 11-3-16    281623    PS PFI/NO PFI    KIESSLING
             PS PFE/NO PFE
- 11-22-16    824052    PSA/NO PFI/BS PFI    KYFF
              NO PFE
- 11-22-16    595524    PSA/NO PFI/BS PFI    KYFF
              NO PFE
- 11-22-16    999681    PSA/NO PFI/BS PFI    STRATTON
              NO PFE
- 11-23-16    686814    PSA/PSI/NO PFI PSE    ESSER
              NO PFE
- 11-23-16    842430    PSA/PSI/NO PFE    ESSER
- 11-23-16    360819    PSA/NO PFI/BS PEI    ESSER
- 11-28-16    999674    NO PFI/ BS PFI/NO    MARTIN
              NO PFE
- 11-28-16    303090    NO PFI/BS PFI/PS PFE    MARTIN
              NO PFE
- 11-28-16    331437    NO PFI    MARTIN
- 11-28-16    226738    NO PFI    MARTIN
- 11-29-16    984666    PSA/PSI/NO PFI    KEITH
- 11-29-16    486264    PSA/PSI/NO PFI    KEITH
- 11-29-16    972299    PSA/PSI/NO PFI    KEITH

- 11-29-16   649473   PSA/PSI/NO PFI   KEITH
- 11-30-16   987756   PSA/NO PFI/BS PFI   VOMASTEK
  PSE
- 11-30-16   999570   PSA/PSPFE/NO PFE   VOMASTEK
- 11-30-16   275000   PSA/NO PFI/BS PFI   VOMASTEK
  NO PFE BS PFE
- 11-30-16   859270   PSA/NO PFI/ PS PFE   _____
  NO PFE
- 11-30-16   450595   PSA   _____
- 11-30-16   365100   PSA   _____
- 12-1-16   320064   NO PFI/NO PFE/   STRATTON
  BS PFI
- 12-1-16   619495   NO PFI/BS PFI   STRATTON
- 12-1-16   257477   NO PFI/ BS PFI   STRATTON
- 12-2-16   881380   PSA/NO PEI/BS   CAMPBELL
  PFI/PS PFE/NO PFE
- 12-2-16   516181   PSA   CAMPBELL
- 12-2-16   679564   PSA/NO PFI/BS PFI   CAMPBELL
- 12-2-16   241540   PSA/NO PFI/NO PFE   CAMPBELL
- 12-5-16   932534   PSA/NO PFI   MCNULTY
- 12-6-16   543532   PSA/NO PFI/BS PFI   KURJAN
  PS PFE/NO PFE
- 12-6-16   623579   NO PFI/BS PFI/PS PFE   KURJAN
  NO PFE
- 12-15-16   213763   PSA/NO PFI/BS PFI   KYFF
  PS PFE/NO PFE
- 12-15-16   97055   PSA   KYFF
- 12-16-16   100952   PSA/PSI/NO PFI   FEENSTRA
- 12-19-16   424847   PS/NO PFI   KURJAN
- 12-19-16   377938   NO PFI/BS PFI   KURJAN
- 12-20-16   816484   PSA/PSE/NO PFE   MACKE
- 12-20-16   636855   PSA   MACKE
- 12-20-16   300637   PSA/NO PFI/BS PFI   MACKE
- 12-20-16   779890   PSA/NO PFI/BS PFI   FEENSTRA
  PSPFE/NO PFE
- 12-21-16   312109   PSA/NO PFI/NO PFE   FEENSTRA
- 12-21-16   802908   PSA/NO PFI   FEENSTRA
- 12-21-16   319516   NO PFE   MARTIN

- 1-5-17   813123   PSA/NO PFI/BS PFI   STRATTON
  NO PFE/BS PFE
- 1-5-17   362911   NO PFI/BS PFI/   STRATTON
  NO PFE
- 1-6-17   546342   PSA/NO PFI/BS PFI   KURJAN
  NO PFE
- 1-6-17   523440   NO PFI/BS PFI   KURJAN
- 1-6-17   372701   NO PFI/BS PFI   KURJAN
- 1-9-17   309951   NO PFI/BS PFI   MACKE
- 1-9-17   229742   NO PFI/BS PFI   MACKE
- 1-11-17   607157   PSA/NO PFI/PS PFE   CAMPBELL
- 1-11-17   274200   PSA/NO PFI   CAMPBELL
- 1-11-17   561999   PSA/NO PFI   CAMPBELL
- 1-12-17   1001216   NO PFI/BS PFI   STRATTON
- 1-12-17   588170   NO PFI/BS PFI   STRATTON
- 1-12-17   213795   NO PFI   STRATTON
- 1-17-17   785738   PSA/PSI/NO PSI   ESSER
  NO PFE/BS PFE
- 1-17-17   317039   PSA/PSI/NO PSI   ESSER
  NO PFE/BS PFE
- 1-17-17   574395   PSA/PSI/NO PEI   ESSER
- 1-19-17   952088   PSA/NO PFI/BS PFI   KERNDT
- 1-19-17   981481   PSA/NO PFI/BS PFI   KERNDT
- 1-25-17   806035   PSA/PSI/NO PFI/PSE   KIESSLING
  NO PFE
- 1-25-17   543574   PSA/PSI/NO PFI/PSE   KIESSLING
  NO PFE
- 1-25-17   238840   NO PFE   STODDARD
- 1-26-17   563755   PSA/NO PFI/BS PFI   STODDARD
- 1-26-17   913023   NO PFI/BS PFI   STODDARD
- 1-27-17   276636   PSA/NO PFI/BS PFI   KURJAN
  NO PFE
- 1-27-17   951709   PSA/PSI/NO PFI   KURJAN
  NO PFE
- 2-3-17   222393   PSA/NO PFI/BS PFI   FEENSTRA
- 2-3-17   408353   PSA/NO PFI   FEENSTRA
- 2-6-17   1001660   NO PFI/BS PFI   STRATTON
  NO PFE

- 2-6-17    309654    NO PFI/BS PFI    STRATTON
- 2-7-17    645879    NO PFI/BS PFI    KERNDT
  NO PFE/BS PFE
- 2-9-17    624045    PSA/PSI/PSE    AULICINO
- 2-9-17    303944    PSA/PSI/NO PFE    AULICINO
- 2-9-17    653038    PSA/PSI/NO PFI    AULICINO
- 2-9-17    672118    PSA/PSI/NO PFI    AULICINO
- 2-13-17    493146    PSA/NO PFI/BS PFI    VOMASTEK
- 2-13-17    827363    PSA/NO PFI/BS PFI    VOMASTEK
  PS PFE/NO PFE
- 2-13-17    552078    PSA/NO PFI/BS PFI    VOMASTEK
- 2-17-17    407646    PSA/NO PFI BS PFI    ESSER
  NO PFE
- 2-17-17    291600    PSA/NO PFI BS PFI    ESSER
  NO PFE
- 2-17-17    217562    NO PFI/BS PFI    ESSER
- 2-20-17    717242    PSA/PSI/PSE    KIESSLING
  NO PFI/NO PFE
- 2-20-17    433097    PSA/PSI/PSE/    KIESSLING
  NO PFI/NO PFE
- 2-27-17    928905    NO PFI/NO PFE    MACKE
- 2-27-17    778829    NO PFI    MACKE
- 2-27-17    1004360    NO PFI/BS PFI    MUNRO
  NO PFE
- 3-1-17    389447    NO PFI/BS PFI    CARMODY
  NO PFE
- 3-3-17    1003005    PSA/PSI/NO PFI    CARMODY
  NO PFE
- 3-3-17    978668    PSA/PSI/NO PFI    CARMODY
  NO PFE
- 3-7-17    1004833    NO PFI/BS PFI/PSA    VOMASTEK
  NO PFE
- 3-7-17    541437    NO PFI/BS PFI/PSA    VOMASTEK
  NO PFE
- 3-8-17    228955    PSA/NO PFI/NO    KURJAN
  MONITORING/NO
  PFE/BS RECORD
- 3-8-17    879050    PSA/NO PFI/NO    KURJAN

|  |  |  | MONITORING/NO PFE/BS RECORD |  |
|---|---|---|---|---|
| • | 3-8-17 | 598681 | PSA/NO PFI/NO MONITORING/NO PFE | KURJAN |
| • | 3-8-17 | 516657 | PSA/NO PFI | KURJAN |
| • | 3-9-17 | 709563 | NO PFI/BS PFI PS PFE/NO PFE | MCNULTY |
| • | 3-9-17 | 757644 | NO PFI/NO PFE | MCNULTY |
| • | 3-13-17 | 985601 | NO PFE | KYFF |
| • | 3-13-17 | 924285 | NO PFI/BS PFI NO PFE | KYFF |
| • | 3-14-17 | 475783 | NO PFI/BS PFI PSPFE/NO PFE | MCNULTY |
| • | 3-14-17 | 508946 | NO PFI/BS PFI | MCNULTY |
| • | 3-16-17 | 265076 | NO PFI/BS PFI NO PFE/BS PFE | STRATTON |
| • | 3-16-17 | 753579 | NO PFI/BS PFI NO PFE | STRATTON |
| • | 3-20-17 | 546775 | PSA/NO PFI/BS PFI NO PFE | AULICINO |
| • | 3-20-17 | 335455 | PSA/NO PFI/BS PFI NO PFE | AULICINO |
| • | 3-20-17 | 636233 | PSA/NO PFI/BS PFI NO PFE | AULICINO |
| • | 3-20-17 | 500283 | PSA/NO PFI/BS PFI NO PFE | AULICINO |
| • | 3-23-17 | 0071912 | ASC/NO PFI/BS PFI PSPFE/NO PFE | AULICINO |
| • | 3-23-17 | 0122489 | ASC/NO PFI/BS PFI PSPFE/NO PFE | AULICINO |
| • | 3-23-17 | 0068774 | ASC/NO PFI/BS PFI | AULICINO |
| • | 3-24-17 | 758188 | PSA/NO PFI/BS PFI | CAMPBELL |
| • | 3-24-17 | 760475 | PSA/NO PFI/BS PFI | CAMPBELL |
| • | 3-29-17 | 0112791 | NO PFI/BS PFI/NO PFE | KERNDT |
| • | 3-29-17 | 0093999 | NO PFI/BS PFI/NO PFE | KERNDT |
| • | 3-30-17 | 0122888 | NO PFI/BS PFI/ASC | KERNDT |
| • | 3-30-17 | 0122892 | NO PFI/ASC | KERNDT |

- 3-30-17    0122493    NO PFI/IV BY RN/    KERNDT
              NO PFE/ASC
- 3-30-17    0006681    NO PFI/BS PFI/NO PFE KERNDT
              ASC
- 3-31-17    800108     PSA/PSI/BSE/NO PFI    KIESSLING
              NO PFE
- 4-8-17     266681     NO PFI/BS PFI/NO PFE AULICINO
- 4-8-17     281148     NO PFI/NO PFE         AULICINO
- 4-8-17     364239     NO PFI/NO PFE         AULICINO
- 4-10-17    998481     NO PFI/BS PFI/PSPFE   SCHAFFLER
              NO PFE
- 4-12-17    920050     PAS/NO PFE/PS PFE     AULICINO
- 4-12-17    894211     PSA/PSI/NO PSPFE      AULICINO
              PS PFE
- 4-13-17    276749     PSA/PSI/NO PFI        SCHAFFLER
              PSE/NO PFE
- 4-13-17    902652     PSA/NO PFI            SCHAFFLER
              NO PFE/NO PREOP
              EVAL
- 4-17-17    259866     NO PFI/BS PFI/PSPFE   KYFF
              NO PFE
- 4-17-17    478092     NO PFI/BS PFI/PSPFE   KYFF
- 4-18-17    970840     PSA/NO PFI/NO PFE     MUNRO
- 4-18-17    832803     PSA/NO PFI/BS PFI     SCHAFFLER
              NO PFE
- 4-19-17    981399     PSA/PS PFI/NO PFI     KIESSLING
              PS PFE/NO PFE
- 4-20-17    672655     NO PFI/BS PFI/NO PFE STRATTON
- 4-20-17    645902     NO PFI/BS PFI         STRATTON
- 5-2-17     631160     PSA/PSI/NO PFI        MCNULTY
              NO PFE/BS PFE
- 5-2-17     688293     PSA/PSI/NO PFI        MCNULTY
- 5-2-17     1009281    PSA/NO PFI/BS PFI     MCNULTY
- 5-4-17     986029     PSA/NO PFI/BS PFI     MCNULTY
- 5-9-17     257729     PSA/NO PFI/BS PFI     STRATTON
              NO PFE
- 5-9-17     692375     PSA/NO PFI/BS PFI     STRATTON
              NO PFE

65

- 5-9-17    680900    NO PFI/BS PFI/PS PFE   STODDARD
  NO PFE
- 5-10-17    890575    NO PFI/NO PFE      MUNRO
- 5-11-17    623662    NO PFI/BS PFI/NO PFE   STRATTON
- 5-11-17    1009995    NO PFI/BS PFI/NO PFE   STRATTON
- 5-11-17    1000500    NO PFI/BS PFI      STRATTON
- 5-14-17    367832    NO PFI/BS PFI      SCHAFFLER
- 5-22-17    400830    PSA/NO PFI/BS PFI   FEENSTRA
  PSE/NO PFE
- 5-22-17    934136    NO PFI/BS PFI      FEENSTRA
- 5-25-17    687366    NO PFI/BSPFI/PSE   STODDARD
  NO PFE/PSA
- 5-25-17    502609    NO PFI/BS PFI/PSE   STODDARD
  NO PFE
- 5-30-17    1010394    PSA/NO PFI/BS PFI   KURJAN
- 5-30-17    286640    NO PFI/BS PFI/NO PFE   KURJAN
- 5-30-17    686414    NO PFI/BSPFI/NO PFE   MCNULTY
- 5-31-17    388695    PSI/NO PFI      MCNULTY
- 6-1-17    402187    NO PFI/NO MON   AULICINO
  NO PFE/BS PFI & MON
- 6-1-17    587676    PSA/PSI/NO PFI/   AULICINO
  NO PFE
- 6-1-17    975408    PSA/PSI/NO PFI/   AULICINO
  NO PFE
- 6-5-17    286088    NO PFI/BS PFI      KEITH
- 6-6-17    286417    NO PFI/BS PFI/   SCHAFFLER
  PSA/NO PFE
- 6-6-17    650337    PSA/PS PFE/   SCHAFFLER
  NO PFE
- 6-6-17    539521    PSA/NO PFE/   SCHAFFLER
  BS PFI
- 6-7-17    268291    PSA/NO PFI/BS PFI   ESSER
  PSE/NO PFE
- 6-7-17    284942    PSA/PSA/NO PFE   ESSER
- 6-8-17    531338    PSA/NOPFI/BS PFI   STODDARD
  NO PFE
- 6-8-17    889609    PSA/NO PFI/BS PFI   STODDARD

- 6-9-17    274489    NO PFI/BS PFI/NO PFE CAMPBELL
- 6-9-17    428847    NO PFI/BS PFI/NO PFE CAMPELL
- 6-9-17    520031    NO PFI/BS PFI    CAMPBELL
- 6-10-17    1011998    PSA/PSI/NO PFI/    KEITH
  NO PFE
- 6-11-17    732341    NO PFI/PRE-OP EVAL  KEITH
  DONE PRE PT. ARRIVAL
  PSE/NO PEI
- 6-11-17    940078    NO PRE-OP EVAL,    KEITH
  NO PEI
- 6-11-17    258781    NO PFI/PRE-OP EVAL  KEITH
  DONE PRE PT. ARRIVAL
  PSE/NO PEI/NO PT. INTERVIEW
  NO PFI/BS PFI/BS PFE
- 6-15-17    566570    NO PFI/PS PFE/    KEITH
  NO PFE
- 6-15-17    1011953    NO PFI/BS PFI    KEITH
  PS PFE/NO PFE
- 6-16-17    366829    NO PFI/BS PFI    KYFF
- 6-16-17    457381    PSA/NO PFI/BS PFI    KYFF
- 6-19-17    913715    NO PFI/NO PFE    FEENSTRA
- 6-19-17    917532    PS PFE/NO PFE    FEENSTRA
- 6-20-17    845816    NO PFI/BS PFI/    STRATTON
  NO PFE
- 6-20-17    1012469    NO PFI/BS PFI    STRATTON
  NO PFE/PSA
- 6-20-17    1005515    NO PFI/BS PFI/PSA    STRATTON
- 6-20-17    817852    NO PFI/ BS PFI/PSA    STRATTON
- 6-21-17    935096    NO PFI/BS PFI/PSA    ESSER
- 6-21-17    376472    NO PFI/BS PFI/PSA    ESSER
- 6-23-17    582712    NO PFI/BS PFI/ PSA    SCHAFFLER
  NO PFE/PS PFE
- 6-26-17    586639    NO PFI/BS PFI/    KEITH
  PS PFE/NO PFE
- 6-26-17    268313    NO PFI/BS PFI    KEITH
  PS PFE/NO PFE PSA
- 6-26-17    553341    NO PFI/BS PFI    KEITH
  PS PFE/NO PFE/PSA

| | | | | |
|---|---|---|---|---|
| • | 6-26-17 | 721762 | PS PFE/NO PFE/PSA | VOMASTEK |
| • | 6-27-17 | 224573 | NO PFI/BS PFI/PSA<br>PS PFE/NO PFE | VOMASTEK |
| • | 6-28-17 | 862378 | NO PFI/BS PFI/PSA<br>PS PFE/NO PFE | VOMASTEK |
| • | 6-28-17 | 1008701 | NO PFI/BS PFI/PSA<br>PS PFE/NO PFE | STODDARD |
| • | 6-29-17 | 281057 | NO PFI/BS PSI | KEITH |
| • | 6-29-17 | 212693 | PSA/NO PFI/BS PFI | KEITH |
| • | 7-5-17 | 239007 | NO PFI/BS PFI/PSA | AULICINO |
| • | 7-6-17 | 750190 | NO PFI/BS PFI/PSA | KYFF |
| • | 7-6-17 | 757924 | PSA/PSE/NO PFE | KYFF |
| • | 7-6-17 | 1003686 | PSA | KYFF |
| • | 7-19-17 | 525591 | NO PFI/BS PFI/PS PFE<br>NO PFE | MUNRO |
| • | 7-20-17 | 237780 | NO PFI/BS PFI<br>PS PFE/NO PFE | FEENSTRA |
| • | 7-22-17 | 106308 | NO MEDICAL<br>DIRCTION | MUNRO |
| | | &<br>641247 | OVERLAP WITH<br>106308 | MUNRO |
| • | 7-28-17 | 255042 | NO PFI/BS PFI/PSA<br>PS PFE/NO PFE | MCNULTY |
| • | 7-28-17 | 975548 | NO PFI/BS PFI/PSA<br>PSE/NO PFE | MCNULTY |
| • | 7-28-17 | 1010014 | PSA/NO PFI/BS PFI<br>PS PFE/NO PFE | MCNULTY |
| • | 7-28-17 | 925565 | PSA | MCNULTY |
| • | 7-28-17 | 424277 | PSA | MCNULTY |
| • | 8-1-17 | 484298 | NO PFI/BS PFI/PSA<br>PS PFE/ NO PFE | KYFF |
| • | 8-1-17 | 954485 | NO PFI/BS PFI/PSA<br>PS PFE/NO PFE | KYFF |
| • | 8-21-17 | 912136 | NO PFI/BS PFI/PSA<br>PS PFE/NO PFE | KURJAN |
| • | 8-21-17 | 1018929 | NO PFI/BS PFI/PSA<br>PS PFE/NO PFE | KURJAN |

- 8-21-17    1007385    NO PFI/BS PFI/PSA    SCHAFFLER
- 8-21-17    299463     NO PFI/BS BFI/PSA    SCHAFFLER
- 8-22-17    737751     NO PFI/BS PFI/PSA    CARMODY
- 8-22-17    1010797    PSA/BSE/NO PFE       KYFF
- 8-31-17    860758     NO PFI/BS PFI/PSA    CARMODY
             PSE/NO PFE
- 8-31-17    625795     PSA/PSI/NO PFI       CARMODY
- 8-31-17    533020     PSA/PSI/NO PFI       CARMODY
- 9-1-17     888558     NO PFI/PSA/PSE/      ESSER
             NO PFE
- 9-1-17     470434     PSA/PSE/NO PFE       ESSER
- 9-5-17     342163     NO PFI/BS PFE/       CAMPBELL
             NO PFE
- 9-6-17     369669     NO PFI/NO PFE        STRATTON
- 9-6-17     945469     NO PFI/NO PFE        STRATTON
- 9-6-17     305731     NO PFE/BS PFE        STRATTON
- 9-6-17     264386     NO PFI/PS PFE/       STRATTON
             NO PFE
- 9-8-17     323885     NO PFI/PSA/BS PFI    KERNDT
             PSA/PS PFE/NO PFE
- 9-13-17    956389     NO PFI/BS PFI/PSA    VOMASTEK
             PS PFE/NO PFE
- 9-13-17    368818     NO PFI/BS PFI/PSA    VOMASTEK
             PS PFE/NO PFE
- 9-13-17    683448     PSA/PS PFE/NO PFE    VOMASTEK
- 9-15-17    1010305    SPINAL IN PREOP      AULICINO
             NO MONITORING
- 9-21-17    298902     NO PFI/PSA/PSE       FEENSTRA
             NO PFE
- 9-21-17    527747     PSA                  FEENSTRA
- 9-21-17    528428     PSA PSA/NO PFE       FEENSTRA
- 9-21-17    1019834    PSA PSE/NO PFE       (unknown)
- 9-22-17    804022     NO PFI/BS PFI/PSA    KERNDT
             PSE/NO PFE
- 9-22-17    251880     NO PFI/BS PFI/PSA    KERNDT
             PSE/NO PFE
- 9-24-17    373489     NO PFI/BS PFI/PS PFE/ KERNDT
             NO PFE

- 9-26-17    249613    NO PFI/BS PFI/PSA    KERNDT
             PSE/NO PFE
- 9-26-17    228621    PSA/BS PFI    KERNDT
- 9-27-17    266585    NO PFI/BS PFI/PSA    KYFF
             NO PFE
- 9-27-17    245772    PSA/PSE/NO PFE    KYFF
- 9-28-17    283168    NO PFI/BS PFI/PSA    CAMPBELL
- 9-28-17    1020114   NO PFI/BS PFI/PSA    CAMPELL
- 9-28-17    506965    PSA    CAMPBELL
- 10-2-17    5453324   NO PFI/BS PFI/PSA    STRATTON
             NO PFE/PS PFE
- 10-2-17    606867    NO PFI/BS PFI/PSA    STRATTON
- 10-4-17    914129    PSA/PSI/PSE/NO PFE    AULICINO
- 10-4-17    898593    BS PFI/NO PFI    AULICINO
             PSA/PS PFE NO PFE
- 10-5-17    282336    PSA/PSI/NO PFI/PSE    KIESSLING
             NO PFE
- 10-5-17    404338    PSA/PSI/PSE/NO PFE    KIESSLING
- 10-6-17    1018758   NO PFI/BS PFI/NO PFE KYFF
             PSE/PSA
- 10-6-17    1021813   NO PFI/BS PFI/PSA    KYFF
- 10-6-17    1022063   PS PFE/NO PFE/PSA    KYFF
- 10-6-17    394064    NO PFI/PS PFI    MARTIN
- 10-10-17   328310    NO PFI/BS PFI/PSA    STODDARD
- 10-10-17   844107    PSA/NO PFE/PS PFE    STODDARD
- 10-10-17   511888    NO PFI/BS PFI/PSE    STODDARD
- 10-10-17   552469    PSA    STODDARD
- 10-11-17   872579    PSA/PSI/NO PFI/    KIESSLING
             PSE/NO PFE
- 10-11-17   247186    PSA/PSI/NO PFI/    KIESSLING
             PSE/NO PFE

- 10-12-17   969793    NO PFI/BS PFI/PSA/    STODDARD
             PS PFE/NO PFE
- 10-16-17   364824    NO PFI/BS PFI/PSA/    CAMPBELL
             PSE/NO PFE
- 10-17-17   370405    NO PFI/BS PFI/PSA/    KURJAN
             NO PFE/PSE

- 10-17-17   779516   NO PFI/BS PFI/PSA/   KURJAN
                       NO PFE
- 10-18-17   548814   NO PFI/BS PFI/PSA/   VOMASTEK
                       PS PFE/NO PFE
- 10-18-17   619517   NO PFI/BS PFI/PSA/   VOMASTEK
                       PSE
- 10-20-17   496493   NO PFI/BS PFI/PSA/   KERNDT
                       NO PFE
- 10-20-17   966364   NO PFI/BS PFI/PSA    KERNDT
                       PSE/NO PFE
- 10-20-17   496493   NO PFI/NO PFE/PSA    KERNDT
- 10-20-17   966364   NO PFI/BS PFI/PSA    KERNDT
                       PSE/NO PFE
- 10-20-17   441835   NO PFI/BS PFI/PSA    KERNDT
- 10-23-17   544835   PSA/PS PFE/NO PFE    KYFF
- 10-23-17   265431   NO PFI/PS PFI/PSA    ESSER
                       PS PFE/NO PFE
- 10-23-17   405754   NO PFI/NO PFE        SCHAFFLER[3]

210.   Relator MCKINLEY observed numerous anesthesiologists engaging in pre-signing the attestations, pre-signing inductions, pre-signing emergence, and other violations of TEFRA.   MCKINLEY gathered significant documentary evidence, but following a meeting on March 17, 2016, meeting with VOMASTEK and AULICINO, detailed above, MCKINLEY destroyed her copies of records fearing she would be terminated.   She kept detailed notes regarding illegal acts as follows:

- July 12, 2016
  Worked with TE – Presigned Emergence
  – MRN 445096

---

[3] Relator has additional knowledge of approximately 1,000 additional false claims submitted from October 2017 through September 18, 2018.

- MRN 989204
- MRN 850717 (**Ex.** ___ - McKINLEY's Journal)

- <u>October 7, 2016</u>
  Worked with VM – Orthopedic Room – Presigned Emergence
  - MRN 680499
  - MRN 897838
  - MRN 510644
  - MRN 936554
  - MRN 697800
  - MRN 238697

- October 13, 2016 – surgery on clavicle with Dr. Chulnard. Returned to work February 6, 2017.

- <u>February 7, 2017</u>
  Worked with RC
  - MRN 270203   presigned emergence
  - MRN 819557   presigned induction, emergence

- <u>February 17, 2017</u>
  Worked with MA
  - MRN 331371   presigned eval
  - MRN 586006   presigned eval, induction, emergence

- <u>March 3, 2017</u>
  Worked with FC
  - MRN 845681   presigned induction, emergence
  - MRN 982018   presigned emergence
  - MRN 227404   presigned emergence
  - MRN 929180   presigned eval, induction

- <u>March 7, 2017</u>
  Worked with EV
  - MRN 854266   presigned eval, emergence
  - MRN 1003485  presigned eval, emergence
  - MRN 236468   presigned eval

- <u>March 16, 2017</u>
  Worked with TE
  - MRN 884447   presigned eval, emergence
  - MRN 563155   presigned emergence
  - MRN 825413   presigned emergence

- <u>March 20, 2017</u>
  Worked with JK
  - MRN 963114   presigned attestation, back signed induction
  - MRN 340863   presigned attestation, presigned emergence
  - MRN 230161   presigned induction emergence
  - MRN 212819

- <u>April 13, 2017</u>
  Worked with CK
  - MRN 815363   presigned induction, back signed, presigned emergence
  - MRN 751538   presigned emergence, back signed induction

- <u>April 18, 2017</u>
  Worked with DF
  - MRN 1007880 no show for induction, back signed induction, presigned emergence
  - MRN 1008587 presigned emergence, back signed maintenance
  - MRN 977403   presigned emergence, back signed induction

- <u>May 2, 2017</u>
  Worked with MM
  - MRN 560401   presigned attestation, back signed induction, back signed maintenance, presigned emergence
  - MRN 954373   presigned induction, back signed maintenance, presigned emergence

- <u>May 4, 2017</u>
  Worked with EV

- MRN 991870    presigned eval, back signed induction maintenance, presigned emergence, presigned attestation
- MRN 398772    presigned eval, presigned attestation, presigned emergence
- MRN 1008597 presigned eval, presigned attestation

- McKINLEY wrote a VOICE on the pt MRN 1008597. EV came into the OR while she was applying monitors. He began pushing medications before she had pre-oxygenated this morbidly obese pt resulting in significant desaturation. This pt's safety was at risk. EV stated as he was pushing medications that he had another induction to get to.

- Munson employees in the OR
- Kuppe
- Haynes
- Bison

- June 29, 2017
  Worked with RO
  - MRN 484946    presigned emergence and attestation

- June 23, 2017
  Worked with CK
  - MRN 578918    presigned attestation, back signed induction, presigned emergence
  - MRN 603220    presigned attestation, back signed induction, presigned emergence

- June 26, 2017
  Worked with MA
  - MRN 988163    presigned attestation, emergence, back signed induction and maintenance
  - MRN 932903    presigned eval, attestation, back signed induction, maintenance

- July 6, 2017
  Worked with MZ

- – MRN 772280    presigned emergence
- – MRN 1008164 presigned attestation

- **\*July 9, 2017**
  Worked with CK

- **July 24, 2017**
  Worked with RC
  - – MRN 572179    pt. given propofol for block by MD (RC) while he
    was supervising AAs and CRNAs

- **September 8, 2017**
  Worked with RC
  - – MRN 897590    presigned induction, attestation, emergence
  - – MRN 485645    presigned   induction,   eval,   attestation   and
    emergence, back signed maintenance

- **September 22, 2017**
  Worked with DF
  - – MRN 1019681 presigned eval, attestation, induction, emergence
  - – MRN 1019682 presigned eval, attestation, presigned emergence

- **October 2, 2017**
  Worked with JS – IP Room #3029
  - – MRN MRN ? 310405 presigned   eval,   attestation,   back   signed
    induction, presigned emergence

- **October 16, 2017**
  Worked with FC
  - – MRN 775980    presigned attestation
  - – MRN 775980    presigned attestation
  - – MRN 937669    presigned attestation

- **October 17, 2017**
  Worked with AK
  - – MRN 310914    presigned   attestation,   emergence,   back   signed
    induction
  - – MRN 664615    presigned   attestation,   emergence,   back   signed
    induction

&ndash; MRN 233151    presigned attestation, emergence

- <u>October 20, 2017</u>
  Worked with EV
  &ndash; MRN 262844    presigned eval attestation
  &ndash; MRN 552849    presigned eval attestation, back signed induction, emergence
  &ndash; MRN 1015065  presigned eval

- <u>October 30, 2017</u>
  Worked with All
  &ndash; MRN 241964    presigned attestation, presigned emergence
  &ndash; MRN 408314    presigned attestation, presigned emergence

- <u>November 2, 2017</u>
  Worked with BC

- <u>November 20, 2017</u>
  Worked with All and CX

- *When CX took over medical direction he sent me a page to sign him into the chart (initial it for him). (picture)

- <u>November 21, 2017</u>
  Worked with AK
  &ndash; MRN 664238    presigned attestation, emergence
  &ndash; MRN 413341    presigned attestation, back signed induction, presigned emergence

- <u>November 30, 2017</u>
  Worked with TE
  &ndash; MRN 486232    presigned attestation, emergence
  &ndash; MRN 884865    presigned attestation, back signed maintenance, presigned emergence

- <u>December 1, 2017</u>
  Worked with DF
  &ndash; MRN 482631    presigned attestation and emergence

- – MRN 939646   presigned attestation and emergence
- – MRN 950394   presigned attestation and emergence

- December 5, 2017
  Worked with MA
  - – MRN 281197   presigned   attestation,   back   signed   induction, presigned emergence
  - – MRN 470430   presigned attestation, emergence
  - – MRN 525263   presigned attestation, emergence
  - – MRN 661822   presigned attestation, emergence

- June 4, 2018
  Worked with DF
  - – MRN 465248   back signed induction, presigned emergence
  - – MRN 545517   back signed maintenance, presigned emergence

- June 5, 2018
  Worked with JS
  - – MRN 895611   back signed induction, presigned emergence
  - – MRN 731345   back   signed   induction,   maintenance,   presigned emergence

- June 14, 2018
  Worked with BK
  - – MRN 1000064 presigned emergence, presigned attestation
  - – MRN 914663   presigned emergence, presigned attestation
  - – MRN 386626   presigned emergence and attestation
  - – MRN 1034153 back   signed   induction,   presigned   emergence   and attestation

- June 15, 2018

  - – MRN 1035203 presigned emergence and attestation

- June 19, 2018
  Worked with RC
  - – MRN 904997   presigned eval, presigned emergence and attestation
  - – MRN 101398   presigned attestation and emergence

- July 3, 2018
  Worked with MZ
  - MRN 308841   presigned attestation and emergence

- July 11, 2018
  Worked with MM
  - MRN 1038793 back signed induction, maintenance, presigned emergence and attestation
  - MRN 885342   presigned emergence and attestation

- July 24, 2018
  Worked with MM
  - MRN 393290   back signed induction and maintenance, presigned emergence and attestation
  - MRN 1027630 back signed induction and maintenance, presigned attestation and emergence

- August 1, 2018
  Worked with EV
  - MRN 953602   presigned eval, emergence and attestation
  - MRN 912361   presigned eval
  - MRN 876258   presigned eval

211. On May 4, 2017, McKINLEY observed during patient HL's operation, VOMASTEK, did not monitor HL.

212. Beginning in 2015 up to her wrongful termination McKINLEY personally observed the dirt ball folder and items contained in the folder, which revealed numerous violations of TEFRA.

## IMPROPER CODING/ALTERATION OF RECORDS

213. Despite evidence to the contrary, Defendants TAA and PHYMED, through Defendant CAMPBELL, changed the QZ modifier to improperly bill the services as medically directed services.

214. Changing a correct billing code to make it to a billable code constitutes a false claim for each claim submitted to the government.

215. Altering records, such as pre-signing, post-signing, changing the billing modifier, are illegal acts giving rise to the submission of false claims.

## COUNT I
## FALSE CLAIMS ACT – PRESENTATION OF FALSE CLAIMS

216. Relators incorporate by reference Paragraphs 1 through 215 of this Complaint.

217. DEFENDANTS knowingly presented or caused to be presented, to (a) the United States and State of Michigan governments or (b) others possessing money or property to be spent or used on the government' s behalf or to advance a government program or interest, false or fraudulent claims for payment or approval, which claims were false or fraudulent by virtue of DEFENDANTS ' violation of the Medicare and Medicaid statutes and regulations and the CMPL contrary to DEFENDANTS' simultaneous certification, or implied certification, to the United States and State of Michigan governments that DEFENDANTS were in compliance with the Medicare and Medicaid laws and other federal and state health care laws, thereby violating the False Claims Act and the Michigan Medicaid False Claims Act.

{H0606391.1}                                    79

218. As depicted in the detailed General Allegations, DEFENDANTS submitted false statements or claims to the federal government set forth in Paragraphs _____.

219. The United States government and the State of Michigan were unaware of DEFENDANTS' improper and illegal conduct and made full payment on, approved, or funded the payment or approval of the false or fraudulent claims, which resulted in damage in an amount to be determined.

## COUNT II
## FALSE CLAIMS ACT – FALSE RECORD OR STATEMENT

220. Relators incorporate by reference Paragraphs 1 through 219 of this Complaint.

221. DEFENDANTS knowingly made, used, or caused to be made or used, a false record or statement (a) material to a false or fraudulent claim (i) presented to an officer, employee, or agent of the United States or (ii) against money or property to be spent or used on the government' s behalf or to advance a government program or interest or (b) to get a false or fraudulent claim paid or approved by the United States and State of Michigan governments, which claims were false or fraudulent by virtue of DEFENDANTS' violation of the federal and state laws and regulations governing Medicare and Medicaid and the CMPL contrary to DEFENDANTS' simultaneous certification, or implied certification, to the United States and State of Michigan governments that DEFENDANTS were in compliance with the Medicare

and Medicaid laws, the CMPL and other federal and state health care laws, thereby violating the False Claims Act and the Michigan Medicaid False Claims Act.

222.   As depicted in the detailed General Allegations, DEFENDANTS submitted false statements or claims to the federal government including those identified in Paragraphs _____.

223.   The United States government and the State of Michigan were unaware of DEFENDANTS' improper and illegal conduct and made full payment on, approved, or funded the payment or approval of the false or fraudulent claims, which resulted in damage in an amount to be determined.

**COUNT III**
**FALSE CLAIMS ACT – CONSPIRACY**

224.   Relators incorporate by reference Paragraphs 1 through 223 of this Complaint.

225.   DEFENDANTS, together with their employees and other persons or entities known or unknown, (a) conspired to defraud the United States and the State of Michigan governments by agreeing to present false or fraudulent claims for payment or approval by the United States  and the State of Michigan governments or (b) otherwise conspired to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval or (c) otherwise conspired to knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim, which claims were false or fraudulent by virtue of

DEFENDANTS' , and the co-conspirators' , violation of federal and state laws and regulations governing Medicare and Medicaid and the CMPL contrary to DEFENDANTS' simultaneous certification, or implied certification, to the United States and State of Michigan governments that DEFENDANTS were in compliance with the Medicare and Medicaid laws, the CMPL and other federal and state health care laws, thereby violating the False Claims Act and the Michigan Medicaid False Claims Act.

226. As depicted in the detailed General Allegations, DEFENDANTS submitted false statements or claims to the federal government, including improper coding and billing as it relates to diagnosis and procedures.

227. The United States government and the State of Michigan were unaware of DEFENDANTS' improper and illegal conduct and made full payment on, approved, or funded the payment or approval of the false or fraudulent claims, which resulted in damage in an amount to be determined.

**COUNT IV**
**VIOLATIONS OF THE CIVIL MONETARY PENALTIES LAW**

228. Relators incorporate by reference Paragraphs 1 through 227 of this Complaint.

229. The provisions of 42 U.S.C. § 1320a-7a, which provisions are known as the Civil Monetary Penalties Law ("CMPL"), provide in relevant part as follows:

(a) Improperly filed claims

Any person (including an organization, agency, or other entity, but excluding a beneficiary, as defined in subsection (i)(5) of this section) that—

(1) knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency (as defined in subsection (i)(1) of this section), a claim (as defined in subsection (i)(2) of this section) that the Secretary determines—

* * * * *

(B) is for a medical or other item or service and the person knows or should know the claim is false or fraudulent,

* * * * *

(5) offers to or transfers remuneration to any individual eligible for benefits under subchapter XVIII of this chapter, or under a State health care program (as defined in section 1320a-7(h) of this title) that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under subchapter XVIII of this chapter, or a State health care program (as so defined);

* * * * *

(7) commits an act described in paragraph (1) or (2) of section 1320a-7b(b) of this title;

shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $10,000 for each item or service (or, in cases under paragraph (3), $15,000 for each individual with respect to whom false or misleading information was given; in cases under paragraph (4), $10,000 for each day the prohibited relationship occurs; or in cases under paragraph (7), $50,000 for each such act). In addition, such a person shall be subject to an assessment of not more than 3 times the amount claimed for each such

item or service in lieu of damages sustained by the United States or a State agency because of such claim (or, in cases under paragraph (7), damages of not more than 3 times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose). In addition, the Secretary may make a determination in the same proceeding to exclude the person from participation in the Federal health care programs (as defined in section 1320a-7b(f)(1) of this title) and to direct the appropriate State agency to exclude the person from participation in any State health care program.

230.   In short, an individual or entity, excluding a federal health care program beneficiary, is subject to the penalties and assessments of the CMPL and to exclusion from participation in any federal health care program when that individual or entity knowingly presents or causes to be presented to the United States government a claim for an item or service and the person knows or should know the claim is false or fraudulent.

231.   DEFENDANTS are also liable under the CMPL for actions of its agent-employees committed within the scope of the agency or employment. *See* 42 U.S.C. § 1320a-7a(l).

232.   As required by law, DEFENDANTS expressly certified to the government that DEFENDANTS were in compliance with all federal health care law and relied upon that certification to obtain reimbursement from Medicare, Medicaid, and other federal health care programs for goods, facilities, services, or items provided to one or more federal health care beneficiaries.

233. DEFENDANTS also implicitly certified to the government that DEFENDANTS were in compliance with all federal health care law and relied upon that certification to obtain reimbursement from Medicare, Medicaid, and other federal health care programs for goods, facilities, services, or items provided to one or more federal health care beneficiaries.

234. As depicted in the detailed General Allegations, DEFENDANTS submitted false statements or claims to the federal government.

235. DEFENDANTS performed the above illegal and improper acts and also directed their agents and employees to commit the same illegal and improper acts in the course of, and within the scope of, their employment.

236. If the United States government had been aware of DEFENDANTS' improper and illegal conduct, including the false certifications, the government would not have made payment on or approved DEFENDANTS' claims for reimbursement under Medicare, Medicaid, and other federal or state health care programs.

237. By agreement and by law, DEFENDANTS were required to comply with all federal health care law, the CMPL, and the rules and regulations of Medicare, Medicaid, and the United States Department of Health and Human Services.

238.   DEFENDANTS acted with actual knowledge, deliberate ignorance, and/or reckless disregard in submitting false or fraudulent claims to the government and in providing remuneration to influence federal or state health care beneficiaries to order or receive goods from a particular supplier.

239.   As a result of DEFENDANTS' false and fraudulent certifications and claims for reimbursement, DEFENDANTS have violated the False Claims Act, the Michigan Medicaid False Claims Act and the CMPL and has caused the United States government and State of Michigan government to suffer damages.

## COUNT V – RETALIATION AS TO STONE

240.   Relators incorporate by reference Paragraphs 1 through 239 of this Complaint.

241.   DEFENDANT TAA and/or PHYMED harassed, retaliated, and discriminated against Relator STONE resulting in his baseless termination from his job in retaliation for his efforts to investigate and his good faith efforts to report fraud and false claims to DEFENDANT TAA and/or PHYMED.

242.   DEFENDANTS TAA and/or PHYMED's actions against Relator STONE caused him injuries, including loss of past and present wages and benefits and past, present and future personal injuries including but not limited to mental distress and anguish.

243. DEFENDANTS TAA and/or PHYMED's actions were carried out in a deliberate manner and conscious disregard of Relator STONE's rights and were malicious, despicable and were intended to harm Relator. STONE is thereby entitled to punitive damages against DEFENDANTS TAA and PHYMED in an amount sufficient to punish DEFENDANTS TAA and PHYMED and exemplary damages to deter future similar conduct.

## COUNT VI – RETALIATION AS TO MCKINLEY

244. Relators incorporate by reference Paragraphs 1 through 243 of this Complaint.

245. DEFENDANT TAA and/or PHYMED harassed, retaliated, and discriminated against Relator McKINLEY resulting in her baseless termination from her job in retaliation for her efforts to investigate and her good faith efforts to report fraud and false claims to DEFENDANT TAA and/or PHYMED.

246. DEFENDANTS TAA and/or PHYMED's actions against Relator McKINLEY caused her injuries, including loss of past and present wages and benefits and past, present and future personal injuries including but not limited to mental distress and anguish.

247. DEFENDANTS TAA and/or PHYMED's actions were carried out in a deliberate manner and conscious disregard of Relator McKINLEY's rights and were malicious, despicable and were intended to harm Relator. McKINLEY is thereby

entitled to punitive damages against DEFENDANTS TAA and PHYMED in an amount sufficient to punish DEFENDANTS TAA and PHYMED and exemplary damages to deter future similar conduct.

## PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of themselves and of the United States and the State of Michigan, request judgment as follows:

A.     The United States and the State of Michigan are entitled to reimbursement of the funds obtained by DEFENDANTS as a result of fraudulent claims submitted to the United States and the State of Michigan.

B.     The United States is entitled to a civil penalty of $5,500 to $11,000, adjusted for inflation, for each false or fraudulent claim plus 3 times the damages sustained by the United States as a result of the false or fraudulent claims.  *See* 31 U.S.C. § 3729(a); 28 C.F.R. 85.3(a)(9).

C.     The United States is entitled to a civil monetary penalty of $10,000 to $50,000 for each violation of the CMPL, plus an assessment of not more than 3 times the amount of each false or fraudulent claim without regard to damages actually sustained by the United States.  *See* 42 U.S.C. § 1320a-7a(a).

D.     The United States is entitled to exclude DEFENDANTS from participation in any federal health care program.  *See* 42 U.S.C. § 1320a-7(b)(7).

E.      Judgment against DEFENDANT TAA and/or PHYMED for Relator STONE in two times the amount of any loss of back pay, future wage loss, past and future loss of benefits, compensatory damages, including mental distress damages, exemplary damages and punitive damages, litigation costs and reasonable attorneys' fees.

F.      Judgment against DEFENDANT TAA and/or PHYMED for Relator MCKINLEY in two times the amount of any loss of back pay, future wage loss, past and future loss of benefits, compensatory damages, including mental distress damages, exemplary damages and punitive damages, litigation costs and reasonable attorneys' fees.

G.      Reinstatement to TAA and/or PHYMED with the same seniority status Relator STONE would have had but for the wrongful termination and discrimination he experienced.

H.      Reinstatement to TAA and/or PHYMED with the same seniority status Relator MCKINLEY would have had but for the wrongful termination and discrimination she experienced.

I.      An order of partial distribution pursuant to the Federal False Claims Act and the Michigan Medicaid False Claims Act, to the Qui Tam Plaintiffs-Relators equivalent to a percentage of the judgments recovered against DEFENDANTS, plus their costs and attorneys' fees.

{H0606391.1}                                    89

J.     Award any other relief this Court deems just.

## DEMAND FOR TRIAL BY JURY

NOW COME Plaintiffs-Relators, SCOTT STONE and BETHANY McKINLEY, on behalf of themselves and the United States of America and the State of Michigan, by and through their attorneys, HERTZ SCHRAM PC, and hereby demand a jury trial in the above-captioned matter.

Respectfully submitted,

HERTZ SCHRAM PC

By:  _____
PATRICIA A. STAMLER (P35905)
MATTHEW J. TURCHYN (P76482)
*Attorneys for Plaintiffs-Relators*
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 335-5000
pstamler@hertzschram.com

Dated: December 21, 2018